UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARMOR SYSTEMS INTERNATIONAL, INC., a Washington corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>FIRST CHOICE BODY ARMOR & EQUIPMENT, INC., a Massachusetts corporation,<br><br>        Defendant. | Civil Action No. 05-10967 RCL<br><br>DECLARATION OF STEVEN T. LOVETT IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL |

I, Steven T. Lovett, do hereby state and declare as follows:

1.    Along with Anthony Scibelli, I am counsel for Plaintiff Armor Systems International, Inc. ("ASI") in this matter.  I make this statement based on my personal knowledge.

2.    Attached as Exhibit A is a true and correct copy of email and letters between counsel discussing discovery that is the subject of ASI's motion to compel.  Relevant portions are highlighted for the court's convenience.

3.    Attached as Exhibit B are true and correct copies of documents produced pursuant to ASI's subpoena to CSI Armoring, Inc. ("CSI") and marked and identified in the CSI deposition as Exhibits 2, 4, 6, 7, 9 and 10.  CSI is the company First Choice hired to install the armor kits that First Choice was responsible for installing.

4.    Attached as Exhibit C is a true and correct copy of excerpts from the deposition of Edward R. Dovner taken on February 2, 2006.

Page 1 - DECLARATION OF STEVEN T. LOVETT IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

5.      Attached as Exhibit D is a true and correct copy of excerpts from the deposition of Edward R. Dovner taken on February 3, 2006.

6.      Attached as Exhibit E is a true and correct copy of excerpts from the deposition of John C. Blackberg taken on March 28, 2006.

7.      Attached as Exhibit F is a true and correct copy of Supplemental Answers of First Choice Body Armor & Equipment, Inc. [to ASI's First Set of Interrogatories] with the relevant portions highlighted for the court's convenience.

8.      Attached as Exhibit G is a true and correct copy of a March 31, 2005 letter from David O'Connor, counsel for First Choice, to me.  Relevant portions are highlighted for the court's convenience.

9.      On February 17, 2006 I had a discovery conference via telephone with John Leone, counsel for First Choice.  The call lasted in excess of 30 minutes.  I confirmed the parties' discussion in a letter dated February 17, 2006, a true and correct copy of which is attached as Exhibit H to this Declaration.  Relevant portions are highlighted for the court's convenience.

10.      On March 21, 2006 I had a discovery conference via telephone with John Leone, counsel for First Choice.  The call lasted close to an hour.  I confirmed the parties' discussion in a letter dated March 21, 2006, a true and correct copy of which is attached as Exhibit I to this Declaration.  Relevant portions are highlighted for the court's convenience.

11.      On April 5, 2006 I sent an email to John Leone requesting a discovery conference to discuss the remaining issues.  A true and correct copy of that email is attached as Exhibit J.  Neither Mr. Leone nor Mr. O'Connor, nor anyone else representing First Choice has responded that request.

12.      The few emails that First Choice has produced in this case fall into four general categories:  (i) email that First Choice faxed to its counsel before discovery began, for example, documents Bates-stamped FC000021-22, 30, (ii) email from its counsel's computer system, and

Page 2 -      DECLARATION OF STEVEN T. LOVETT IN SUPPORT OF PLAINTIFF'S
                MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Portland3-1518764 1 0060162-00002

(iii) email from Mr. Dovner's computer that have nothing to do with this case, such as FC000044, and (iv) 15 email from the computer of Damita Godfrey, a departed First Choice accounting department employee, which I was told First Choice found when reviewing her computer after her departure. It appears the email from Ms. Godfrey's computer were printed out using the computer of Anne Sullivan, another employee in First Choice's accounting department. The email indicate they were printed on two dates: February 20, 2006 and March 1, 2006. I received a set of those email on or about March 22, 2006. The email found in Ms. Godfrey's computers are routine accounting documents and are of little value in this case. Attached as Exhibit K is a true and correct copy of FC000021-22, 30 and 44 referenced above and produced by First Choice in this case.

13.     Attached as Exhibit L is a true and correct copy of email produced from ASI's computer system and marked by First Choice as Deposition Exhibit 35. First Choice has asked several ASI deposition witnesses about those email.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of April, 2006 at Portland, Oregon.

_____
Steven T. Lovett

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **DECLARATION OF STEVEN T.**

**LOVETT IN SUPPORT OF MOTION TO COMPEL** on the following named person on the

date indicated below by

☐ mailing with postage prepaid

☐ hand delivery

☐ Facsimile transmission

☐ overnight delivery

☒ Email

☐ notice of electronic filing using the Cm/ECF system

to said person a true copy thereof, contained in a sealed envelope, addressed to said person at his

last-known address indicated below.

> David M. O'Connor
> John Leone
> O'Connor & Associates, LLC
> 100 State Street, 4th Floor
> Boston, MA  02109

> Attorney for Defendant First Choice Body Armor & Equipment, Inc.

DATED:  April 28, 2006.

_____
STEVEN T. LOVETT, *Pro Hac Vice*
OSB No. 91070
Telephone:  (503) 224-3380

Attorneys for Plaintiff Armor Systems International,
  Inc.



**STOEL RIVES** LLP
ATTORNEYS AT LAW

900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon 97204
main 503.224.3380
fax 503.220.2480
www.stoel.com

STEVEN T. LOVETT
*Direct (503) 294-9364*
stlovett@stoel.com

February 7, 2006

**VIA EMAIL**

John Leone
O'Connor & Associates
100 State Street
Boston, MA 02109-2306

**Re:**  *Armor Systems International, Inc.  v. First Choice Body Armor & Equipment, Inc.*
**U.S. District Court of Massachusetts Case No. 05-10967 RCL**

Dear John:

> Edward Dovner testified at his deposition that First Choice collected all email related to the project and gave it to counsel. He also testified that he exchanged email with KBR regarding vehicle inspection issues, including at least one before and one after delivery of vehicles 1 and 2.
>
> ASI requested all of those materials months ago. Despite FCA's representation that it had produced all materials responsive to ASI's requests, we have seen few, if any, email and none between FCA and KBR.

At the deposition, you committed to get to me any and all email responsive to ASI's discovery requests. Please let me know when I can expect them. As you know, discovery closes in less than two months. I need to know what you have and when I will get it as soon as possible.

Very truly yours,

Steven T. Lovett

STL:ssb
cc:     Anthony Scibelli
        Client

Lovett Declaration
Exhibit _A_ Pg _1_

Oregon
Washington
California
Utah
Idaho



STEVEN T. LOVETT
Direct (503) 294-9364
stlovett@stoel.com

February 16, 2006

**VIA EMAIL**

John Leone
O'Connor & Associates
100 State Street
Boston, MA 02109-2306

Re:   *Armor Systems International, Inc.  v. First Choice Body Armor & Equipment, Inc.*
U.S. District Court of Massachusetts Case No. 05-10967 RCL

Dear John:

I write pursuant to Rule 37 to request a discovery conference to discuss the following issues:

1.   **First Choice's Failure to Produce Email and Other Electronically Stored Materials.**

Last week I emailed to you a letter asking when we will receive First Choice's email records that we requested starting last June.  In November, First Choice represented that it had produced all responsive materials.  In the deposition of its Rule 30(b)(6) witness, however, it was revealed that First Choice had exchanged any number of email with KBR, including an email from KBR's representative to First Choice's representative on the Ford Excursion Project regarding complaints about the condition of the first two vehicles delivered to Houston.  This email was received by First Choice *before* KBR called to complain about the vehicles.  Yet that email has never been produced in this case, nor have others about which the witness testified.

First Choice had no explanation for its failure to produce its email records and, in fact, testified that it provided those email to its counsel many months ago.  You said on the record during the February 2, 2006 deposition that First Choice would produce its electronically stored records.  Two weeks later, and I have neither the materials nor a response to my letter.

Lovett Declaration
Exhibit  A  Pg 2

Portland3-1542196.1 0069162-00003



John Leone
February 16, 2006
Page 2

### 2.    Scheduling of Additional Depositions.

In my February 10, 2006 letter I showed you the courtesy of asking your availability for a deposition of Rodman Ford and gave you a two week period to choose from. You haven't responded to my letter.

Several days after receiving my letter, however, you found time to notice depositions of three ASI employees *without consulting me*. Worst yet, you noticed three witnesses for Thursday, Friday and the following Monday, thus requiring me to stay in Boston over the weekend. That would be a profound waste of time and money as you undoubtedly realize. In addition, neither the Billedeaux nor the Colin Henry deposition will take anything like a full day. Those two depositions can *easily* take place in one day. Yet you noticed them up, without consulting me, for a Friday and a Monday.

As always, I am open to discussing a schedule that works for *both* parties, your unilateral actions notwithstanding. During our discovery conference we should schedule the depositions of the witnesses you've noticed, the Rodman deposition and the deposition of Ryan Dovner.

### 3.    Updated Information Regarding First Choice's Bids for KBR Business.

Two weeks ago at Mr. Dovner's deposition I asked him for an update on First Choice's bids on KBR projects and any business First Choice had received from KBR, as expressly required in ASI's discovery requests. Mr. Dovner, as First Choice's Rule 30(b)(6) witness, was obligated to know the status of any First Choice bids and work for KBR. He wasn't prepared. First Choice needs to produce that information.

### 4.    Records of First Choice's Invoices to KBR and KBR's Payments to First Choice.

Mr. Dovner, as First Choice's Rule 30(b)(6) witness, was also obligated to answer questions about payments First Choice made and received on the Ford Excursion project. But when I showed him Deposition Exhibit 121, the only document First Choice produced showing payments First Choice received from KBR, he testified he had never seen the document before. First Choice must produce its records relating to invoices First Choice sent KBR and payments it received from KBR.



John Leone
February 16, 2006
Page 3

Currently, my schedule is flexible through Thursday, February 23, 2006.  Let me know what dates and times work for you to confer on these issues.

Very truly yours,

Steven T. Lovett

STL:ssb
cc:    Anthony Scibelli
       Client

Lovett Declaration
Exhibit _A_ Pg _4_

# O'CONNOR & ASSOCIATES, LLC

## ATTORNEYS AT LAW

100 STATE STREET - FOURTH FLOOR
BOSTON, MASSACHUSETTS 02109-2306

TELEPHONE  (617) 723-7201
FACSIMILE    (617) 723-7202
ADMIN@OCONNORANDASSOCIATES.COM

February 17, 2006

**VIA ELECTRONIC & U.S. MAIL**

Steven T. Lovett, Esq.
STOEL RIVES, LLP
900 S.W. Fifth Ave., Suite 2600
Portland, OR  97204

RE:  **Armor Systems International, Inc. v. First Choice Body
Armor & Equipment, Inc.
U.S. District Court - District of Massachusetts
Civil Action No. 05-10967-RCL**

Dear Steve:

This letter is in follow up to our telephone conference of February 17 and in response to your letter of February 16 regarding the issue concerning electronically stored materials. This letter is not intended to address the other issues we addressed.

At deposition, Mr. Dovner testified that e-mails are saved for only thirty days before the data is written over. I told you during our telephone conference that while I do not yet have the deposition transcript, if Mr. Dovner did testify that he gave copies of e-mails to counsel some time ago, he was either: (a) thinking of the e-mails that we have already produced (documents marked 00019, 00020-22, 00030 and 00044) or (b) he is simply mistaken. I assure you that, with the exception of the records referenced below, this office has produced all non-privileged electronic data that FCA has provided to this office in response to your document requests.

Since the deposition of Edward Dovner, FCA has searched its electronic data for any electronic data which ASI has requested. FCA was unable to find a single e-mail responsive to your requests.

Lovett Declaration
Exhibit  A  Pg 5

O'CONNOR & ASSOCIATES, LLC

As I explained to you, while searching through my file, I came across documents pertaining to RFQ No. W900813. These documents were evidently transmitted via e-mail to KBR. I enclose them to you now. They are marked 000779-783.

Thank you for your attention to this matter.

Very truly yours,

*John A. Leone*

John A. Leone

cc:  Anthony A. Scibelli, Esq.



STEVEN T. LOVETT
*Direct (503) 294-9364*
stlovett@stoel.com

February 17, 2006

**VIA EMAIL**

John Leone
O'Connor & Associates
100 State Street
Boston, MA 02109-2306

**Re:    *Armor Systems International, Inc.  v. First Choice Body Armor & Equipment, Inc.*
U.S. District Court of Massachusetts Case No. 05-10967 RCL**

Dear John:

I write to confirm our telephone call of today and to respond to your subsequent letter.

**1.    First Choice's Email and Other Electronically Stored Information.**

I will notice the deposition of John Blackberg of First Choice for 4:00 p.m. on Thursday,
March 9, 2006, following Mr. Marciano's deposition.

**2.    Deposition Scheduling.**

You said that you didn't have Dave's schedule and couldn't commit to any particular dates but
asked that I suggest a schedule.  Here's what I suggested, with the understanding that I haven't
yet heard from all ASI witnesses as to availability:

Wednesday March 8 at Scibelli Whitely:

10:00  Rodman Ford

2:00   Ryan Dovner

Thursday March 9 at O'Connor and Associates:

10:00  Bob Marciano

Portind3-1542522.1 000016240003

Lovett Declaration
Exhibit *A*  Pg 7



John Leone
February 17, 2006
Page 2


4:00    John Blackberg

Friday March 10 at O'Connor and Associates:

9:00    Terry Billedeaux

11:00   Colin Henry

You have already received the subpoena of Rodman Ford and the amended notice of deposition
for Ryan Dovner. As I mentioned to you and state in my cover letter to Rodman, the date or time
of the deposition may need to move when the parties firm up the deposition schedule.

### 3.    Updated Information on First Choice's Bids for KBR Business.

You said First Choice is collecting this information and will produce what there is.

### 4.    Records of First Choice's Invoices to KBR and KBR's Payments to First Choice.

After discussing this issue, we agreed that First Choice would either (1) stipulate that Deposition
Exhibit 121 is a First Choice business record that accurately reflects the date First Choice
invoiced KBR for the vehicles, that the invoice date is the same as the ship date and that the
document accurately reflects the dates First Choice received payment from KBR for the vehicles
via Electronic Funds Transfer or (2) produce invoices and other documents that show invoice
and shipment dates and dates on which First Choice was paid by KBR and the amount of each
payment.

Please let me know right away if you disagree with my description of any aspect of our
conversation.

Very truly yours,

Steven T. Lovett
STL:ssb
cc:    Anthony Scibelli
        Client

Lovett Declaration
Exhibit _A_ Pg _8_



STEVEN T. LOVETT
*Direct (503) 294-9364*
stlovett@stoel.com

February 27, 2006

**VIA EMAIL**

John Leone
O'Connor & Associates
100 State Street
Boston, MA  02109-2306

**Re:**  ***Armor Systems International, Inc.  v. First Choice Body Armor & Equipment, Inc.***
**U.S. District Court of Massachusetts Case No. 05-10967 RCL**

Dear John:

I write pursuant to Rule 37 to request a discovery conference to discuss the following issues:

**1.**    <u>**Pre-2004 KBR Related Documents**</u>.

Eddie Dovner testified at his deposition that First Choice Body Armor & Equipment, Inc. ("FCA") first sold vests to KBR in 2003 and that FCA had been trying to obtain business from KBR for at least a year before that.  (E. Dovner 2/3 Dep. at 31-32.)  FCA, however, has not produced any RFQs from KBR or corresponding bids dated before February 24, 2004 or any purchase orders from KBR dated before June 21, 2004.  In addition, FCA's customer ledger for KBR begins January 1, 2004.  RFQs, bids, purchase orders, ledgers and invoices related to KBR from 2002 through 2003 time period are relevant to FCA's claimed damages and would be responsive to ASI's Document Requests Nos. 10, 11, and 12 and must be produced.

**2.**    <u>**Other Missing KBR Documents**</u>.

There are also a significant number of KBR-related documents from the 2004 through 2005 time period that are missing from FCA's production.   For example, FCA has not produced the bid it

Lovett Declaration
Exhibit _A_ Pg _9_



John Leone
February 27, 2006
Page 2

submitted to KBR on the Ford Excursion Project.  FCA also has not produced RFQ VCG00660 (referenced in Purchase Order HUP 8756, which is Bates numbered 00745).  FCA has produced three bid/quotation documents (documents Bates numbered 000265, 000266, and 000276) without producing the RFQs to which they responded.  Finally, FCA has not produced any of its invoices to KBR.  These RFQs, bids and invoices (and any attachments and transmittal sheets) must be produced.

3.  **Redacted Purchase Orders.**

At his deposition, Eddie Dovner testified that after ASI's alleged breach, FCA lowered its bids to regain KBR confidence and that in light of the way these bids compared to the previous bids FCA had won and lost, there was "no way" FCA could have lost the awards.  (See E. Dovner 2/3 Dep. at 80:10-14; 95:2-8).  We cannot evaluate this claim, however, as FCA still has not produced unredacted copies of the vast majority of the bids it submitted to KBR, as well as several of the purchase orders it received from KBR, including the following:

| RFQ or PO | Starting Bates No. |
|-----------|--------------------|
| Unknown   | 000265 |
| Unknown   | 000266 |
| ICO5855   | 000268 |
| VCP3448   | 000274 |
| Unknown   | 000276 |
| C02473    | 000279 |
| HO1318    | 000288 |
| VCAP150   | 000296 |
| IGO4741   | 000303 |
| Unknown   | 000310 |
| Unknown   | 000315 |
| VCG0922   | 000320 |
| B07184    | 000326 |
| IGO8667   | 000331 |
| IGO08668  | 000336 |
| VCA6749   | 000342 |
| Z000821   | 000351 |
| IC00411   | 000358 |
| HU04319   | 000363 |
| H01820    | 000372 |
| HO1424    | 000735 |

Lovett Declaration
Exhibit _A_ Pg _10_



John Leone
February 27, 2006
Page 3

| HUP8756 | 000745 |
|---------|--------|
| HO0194 | 000748 |
| RFQ8669 | 000753 |
| HU03080 | 000763 |
| VCW2628 | 000767 |
| VCPG911 | 000773 |
| HO1805 | 000730, 000367 |
| VCG1099 | 000739, 000742 |

Please provide us with unredacted copies of these bids and purchase orders.

**4.     Cutoff RFQ Numbers.**
FCA has produced two RFQs with the RFQ number cut off at the top of the page. (*See* documents Bates numbered 000310 and 000315). Please provide substitute copies showing the full document.

**5.     Documents Relating to FCA's Lost Profits.**

FCA has not produced any documents evidencing its revenues, profits or costs related to the product lines that would have been the subject of the KBR contracts it contends it should have been awarded. Nor has FCA produced any of the documents it consulted or quotations it obtained from potential subcontractors in preparing any of its bids to KBR (other than for the Ford Excursion Project). These documents are responsive to ASI's Document Requests Nos. 10, 11, and 12. Please produce them.

By seeking its future profits, FCA has also put its performance under the other contracts with KBR in issue. Indeed, FCA's theory that ASI is responsible for its lost profits damages relies on the premise that FCA's performance under each of the other contracts was blemish-free. Other than bids and purchase orders, however, no documents relating to FCA's performance has been produced. ASI is entitled to all communications with KBR and/or any subcontractors regarding these contracts and to all documents evidencing when the goods identified to the contracts were shipped, KBR invoiced, and payment, if any, received. Again, these documents are responsive to ASI's Document Requests Nos. 10, 11, and 12 and must be produced.

Lovett Declaration
Exhibit *A* Pg *11*



John Leone
February 27, 2006
Page 4

I look forward to discussing with you shortly these and other pending discovery issues.

Very truly yours,

Steven T. Lovett

STL:ssb
cc:     Anthony Scibelli
        Client

Lovett Declaration
Exhibit *A* Pg *12*



STOEL
RIVES
LLP
ATTORNEYS AT LAW

700 S.W. Fifth Avenue, Suite 2600
Portland, Oregon 97204
main 503 294 1580
fax 503 220 2480
www.stoel.com

STEVEN T. LOVETT
*Direct (503) 294-9364*
stlovett@stoel.com

March 21, 2006

**VIA EMAIL**

John Leone
O'Connor & Associates
100 State Street
Boston, MA  02109-2306

**Re:** *Armor Systems International, Inc.  v. First Choice Body Armor & Equipment, Inc.*
**U.S. District Court of Massachusetts Case No. 05-10967 RCL**

Dear John:

I write to confirm our telephone conversation of today regarding each of the outstanding requests outlined in my March 14, 2006 letter to you.  I take each of the letters covered in my March 14 letter in turn.

**February 16 and 17, 2006 Letters**

I understand you have the updated information on First Choice's bids, RFQs and Purchase Orders for KBR business and that those documents will go out to me via overnight mail either today or tomorrow.

You also have in your possession for production today or tomorrow all First Choice invoices to KBR.  In addition, First Choice will stipulate that the Electronic Fund Transfer dates are accurately reflected on Deposition Exhibit 121.

**February 27, 2006 Letter**

1.      You confirmed that Edward Dovner's testimony that First Choice started to obtain work from KBR in 2003 is mistaken and that the first RFQ from KBR to First Choice is dated February 24, 2004.

2.      You are producing today or tomorrow both of the original bids on the Ford Excursion Project.

Oregon
Washington
California
Utah
Idaho

Portlnd3-1545598.1 0060162-00003

Lovett Declaration
Exhibit *4*  Pg *13*



John Leone
March 21, 2006
Page 2

We did not specifically discuss the other documents described in paragraph 2 of my February 27, 2006 letter. I know from our March 14, 2006 conversation that you had requested those materials from First Choice and anticipated producing them. Please let me know if that is no longer the case.

3.    You said you still do not know whether First Choice is willing to produce the unredacted purchase orders and bids that ASI has requested.

4.    Received.

5.    You said that First Choice did not have any documents showing profits, revenues, or costs on any of the projects that it asserts it would had been awarded by KBR but for ASI's performance on the Ford Excursion Project. You and I then discussed that ASI is not looking for something so narrow. Though the documents you have described would be responsive and relevant, what we want are any documents related to revenues, profits and costs on any of the products that are the subject of a KBR RFQ that First Choice contends it would have won. I pointed out that, if First Choice got to trial with its lost profits claim, it would need to show not only the total price of the lost project but also what its profits would have been had that project been awarded it. So, First Choice would have to show material, labor and overhead costs, among other things. We want documents reflecting those costs.

You are going to go back to First Choice on those issues as your inquiry to them was more narrow than that.

**March 1 and 10, 2006 Letters**

You are producing today or tomorrow the complete 34-page fax of which 000781-000783 is a part. You had not focused on the similar question regarding document 000704-000707 which indicates it is pages 1 through 4 from a 19-page fax but will produce the rest of that document as well. You are also going to produce the REP&CERTS.pdf enclosed with Kim Sawyer's October 25, 2005 email to Fayyaz Sarwar of KBR.

You said that your client has failed to locate the original Purchase Order on the Ford Excursion Project.



John Leone
March 21, 2006
Page 3

Please let me know immediately if you disagree with any portion of the above description of our conversation.

Very truly yours,

Steven T. Lovett

STL:ssb
cc:     Anthony Scibelli (via email)
        Client (via email)

Lovett Declaration
Exhibit A Pg 15

**Lovett, Steven T.**

| | |
|---|---|
| **From:** | Lovett, Steven T. |
| **Sent:** | Wednesday, April 05, 2006 2:48 PM |
| **To:** | 'John A. Leone' |
| **Subject:** | RE: ASI v. FCA |

John -

I will find out Mssrs Henry and Billedeaux availability and get back to you.  In the meantime, please determine Eddie Dovner's availability to complete his deposition, also via telephone.

Also, please let me know when you are available to confer about remaining discovery issues, all of which have been covered in previous communications.

- Steve

Steven T. Lovett
Technology and Intellectual Property Group
Stoel Rives LLP
900 SW Fifth Avenue
Suite 2600
Portland OR  97204
503-294-9364
503-220-2480 (fax)

## Jorge Mundo CSI

**From:**    "Jorge Mundo CSI" <jomundo@csiarmoring.com>
**To:**      "Edward Dovner" <edovner@firstchoicearmor.com>
**Sent:**    Tuesday, March 08, 2005 3:47 PM
**Attach:**  FCA Suburban cost.doc; Proposal FCA.doc
**Subject:** Info

Eddie:

Please find attached preliminary information a per our phone conversation.

Please review our estimated material and labor cost for the armoring on the Chevy Suburban, level B6 with complete armoring. Note that we haven't include any general and administrative expenses.

Any suggestions, comments etc. are welcome.

Best Regards;


Jorge Mundo
C.S.I. Armoring Inc.
www.csiarmoring.com
(305) 592-5584 Phone,
(305) 592-1802 Fax,
(305) 582-0278 Mobile.
8693 NW 70 ST
MIAMI, FL 33166

*** All information contained in these message or its attachments is considered privileged. If you receive it in error, please notify sender.***



Mundo
**EXHIBIT NO.** 2
12-22-05
Schmitt & Lehmann, Inc.

Lovett Declaration
Exhibit *B* Pg *1*

CSI0030          12/3/2005



Miami, March 8, 2005

**First Choice Armor Inc.**
Attn.: Eddie.

As per our conversation yesterday, I will like to confirm the following;

F.C.A. & C.S.I. will work together in equal join venture on the armoring of vehicles as per customers request. Vehicles will be built with the best available materials and technology supplied by either company. Main vehicle will be Chevy Suburban.

F.C.A. will provide their technology and special materials as necessary.

C.S.I. will provide the labor and will give priority to these units; if necessary or convenient will expand its building facilities.

All materials used in the armoring will be charged at net cost; Management from both companies will review and approve all costs and expenses.

Gross profits will be divided equally.

Warranties:

Chassis:      Provided by the manufacturer if any on the country of final destination.
Armoring:    Transparent material: Supplied by the manufacturer up to twelve months.
             Opaque material: Supplied by the manufacturer up to twelve months.
             (Ballistic Certificates will be available).
             Labor: 6 (six) months.



**Liability:**    Will be covered by materials manufacturers and by insurance companies' policies.

Notes:    No logos will be place on the transparent material
F.C.A. banner can be placed on outside building when necessary.
Any information acquired during this venture will remain sole property of provider including customer's information.
Full commitment is expected from each party during this venture.



# First Choice Armor Inc. / CSI Armoring Inc.

Cost of Armoring Level B6 for Chevy. Suburban.

Set of Ballistic Glasses (8 pieces) 38-42 mm

<u>Steel Areas:</u>     4' x 8' sheets

1/8     Floor, Gas Tank.          3 x

3/16"   Battery, Firewall, Roof.   2.75 

3/8"    Doors, Pillars, Roof-Crown, Tailgate (Cage), Overlapping, Cargo Area, Frames, etc.          3.75 x 

<u>Mechanical:</u>

Suspension: Torsion Bars, Coil Springs, Leafs, Brake Pads.

Run Flat system (5), Mounting, Balance, and Alignment. 

Siren and PA system 100 watts

<u>Consumable Materials</u>

Welding, glue, etc… 

Paint and Body Shop

Aramid Material 9 ply.  2,5 

Labor

Estimated Total Net Cost. 

**Jorge Mundo CSI**

| | |
|---|---|
| **From:** | "Edward Dovner" <edovner@firstchoicearmor.com> |
| **To:** | "J. Mundo" <jmundo@bellsouth.net> |
| **Sent:** | Sunday, March 20, 2005 11:18 AM |
| **Subject:** | RE: Emailing: Vehicle Checklist |

Thank you so mucho for this.  I appreciate your promptness.  I have added a bunch of stuff that corresponds with what I do.

I have a question for you.  You pointed out while at the dealership with regards to the window protection.  We are mounting the steel on the outside at the bottom of the windshield. There is a gap of about 3/4 of a inch.  You mentioned that we could accomplish this by doing it on the inside? How to do.  We thought about that but can't get the dash back in if we tryed it our way.


Best regards
Eddie


**From:** J. Mundo [mailto:jmundo@bellsouth.net]
**Sent:** Saturday, March 19, 2005 2:21 PM
**To:** Edward Dovner
**Subject:** Fw: Emailing: Vehicle Checklist


Jorge Mundo
C.S.I. Armoring Inc.
www.csiarmoring.com
(305) 592-5584 Phone,
(305) 592-1802 Fax,
(305) 582-0278 Mobile.
8693 NW 70 ST
MIAMI, FL 33166

*** All information contained in these message or its attachments is considered privileged. If you receive it in error, please notify sender.***
----- Original Message -----
**From:** J. Mundo
**To:** cpiper@firstchoicearmor.com
**Sent:** Saturday, March 19, 2005 2:01 PM
**Subject:** Emailing: Vehicle Checklist


Your files are attached and ready to send with this message.



Mundo

EXHIBIT NO. 4
12.22.05
Schmitt & Lehmann, Inc.

## Jorge Mundo CSI

**From:** "Jorge Mundo CSI" <jomundo@csiarmoring.com>
**To:** "Edward Dovner" <edovner@firstchoicearmor.com>
**Sent:** Monday, March 21, 2005 2:48 PM
**Subject:** info Excursion Miami

Work in Miami

FCA/CSI

Equipment provide by F.C.A. /Labor by C.S.I.:

| | |
|---|---|
| Glass | Installation |
| Brakes | Replace Rotors |
| Rear Bumper | Installation |
| PA system | Installation |
| Run flats | Installation |
| Under Carriage | Installation |
| Front Fenders  Steel | Installation |

Materials provide and installed by C.S.I.:

| | |
|---|---|
| Roof Steel | 3/16" |
| Floor Steel & Firewall | 3/16" |
| Pillars, Frames, Overlapping | 3/8" |
| Rear Division | 3/8" |
| Battery | 1/8" |
| Crown Roof | 3/8" |
| Brush Guard Grille | 3/16" |
| Tailpipe mash | n/a |
| Gas Tank, Rinoliner or Similar 3 ply | n/a |
| Consumables | n/a |
| Side steps | n/a |

Total $16,150.oo

Please Review and advice.

Jorge Mundo
C.S.I. Armoring Inc.
www.csiarmoring.com
(305) 592-5584 Phone,
(305) 592-1802 Fax,
(305) 582-0278 Mobile.
8693 NW 70 ST
MIAMI, FL 33166



EXHIBIT NO. 4
12 22 05
SCHMITT & LEHMANN, INC.

*** All information contained in these message or its attachments is considered privileged. If you receive it in error, please notify sender.***

Lovett Declaration
Exhibit *B*  Pg *6*

CSI0032

12/3/2005

## Jorge Mundo CSI

**From:** "Jorge Mundo CSI" <jomundo@csiarmoring.com>
**To:** "Edward Dovner" <edovner@firstchoicearmor.com>
**Sent:** Tuesday, April 12, 2005 7:57 AM
**Subject:** inventory final

| F.C.A. Inventory | Notes |
|---|---|
| Reinforced Grills | 8 |
| Electric Fans (radiator) | 8 |
| Optima Battery's | 16 |
| Brake Pads sx57 | 37 |
| Brake Pads sx56 | 31 |
| 3 ton jacks | 8 |
| Fire extinguishers | 21 |
| WIX Air filters | 32 |
| Wiper Blades 05520 | 50 |
| Wiper Blades 05699 | 104 |
| Westin Brush Guards | 8 |
| Fuel Filters 33599 | 32 |
| Oil Filters 57314 | 30 |
| Setina Rear push bumpers | 8 |
| Hands Free cellular kit | 7 |
| Tie strap kits | 8 |
| Rotors 074 | 8 |
| Rotors 078 | 8 |
| First aid Kits | 8 |
| Run flat set | 4 |
| Roof caps | 8 |
| Foam cube for gas (little) | 6 |
| Foam cube for gas (big) | 10 |
| Glass for doors | 27 |
| Windshields | 7 |
| Rear glass | 7 |
| Bulk head divisions | 8 |
| Under body protection kit | 8 |
| Gas Tank (loose) | 3 |
| | |
| P. A System | 8 |
| | |
| Running Boards Tubular | 7 sets |
| Window motors | 10 |
| Spare tires | 8 |
| Gas caps Loch | 7 |



Mundo
EXHIBIT NO. 7
12·22·05
SCHMITT & LEHMANN, INC.

Items in red : missing some parts,
Also please note quantities of spare parts

Jorge Mundo
C.S.I. Armoring Inc.
www.csiarmoring.com
(305) 592-5584 Phone,
(305) 592-1802 Fax,
(305) 582-0278 Mobile.
8693 NW 70 ST
MIAMI, FL 33166

*** All information contained in these message or its attachments is considered privileged. If you receive it in error, please notify sender.***

## Jorge Mundo CSI

**From:** "Edward Dovner" <edovner@firstchoicearmor.com>
**To:** "Jorge Mundo CSI" <jomundo@csiarmoring.com>
**Sent:** Thursday, April 07, 2005 2:41 PM
**Subject:** RE: Missing Glass

It will be shipping on Monday.

Eddie

**From:** Jorge Mundo CSI [mailto:jomundo@csiarmoring.com]
**Sent:** Wednesday, April 06, 2005 8:00 AM
**To:** Edward Dovner
**Subject:** Missing Glass

Eddie:


Missing Glass for rear partition;

12" x 36" x 2 1/4" Clear

Thanks,


Jorge Mundo
C.S.I. Armoring Inc.
www.csiarmoring.com
(305) 592-5584 Phone,
(305) 592-1802 Fax,
(305) 582-0278 Mobile.
8693 NW 70 ST
MIAMI, FL 33166

*** All information contained in these message or its attachments is considered privileged. If you receive it in error, please notify sender.***



Mundo
EXHIBIT NO. 9
12-22-05
SCHMITT & LEHMANN, INC.

## Jorge Mundo CSI

**From:** "Edward Dovner" <edovner@firstchoicearmor.com>
**To:** "Jorge Mundo CSI" <jomundo@csiarmoring.com>
**Sent:** Friday, April 08, 2005 4:19 PM
**Subject:** RE: QUESTION PART

When my guy goes there next week I will know right away.

Eddie

**From:** Jorge Mundo CSI [mailto:jomundo@csiarmoring.com]
**Sent:** Friday, April 08, 2005 12:29 PM
**To:** Edward Dovner
**Subject:** QUESTION PART

EDDIE

WE HAVE RECEIVED 8 OF THIS PIECES

3 UNITS LOOK DAMAGED, WE BELIEVE THEY ARE COMPLETE RIGID, THEY ARE BENDED IN SOME PLACES ABOVE THE MARK (3 INCHES ABOVE STRIKE FACE) PLEASE LET ME KNOW IF WE NEED TO REPLACE THEM.

JORGE

Mundo

EXHIBIT NO. 10
12-22-05
SCHMITT & LEHMANN, INC.

```
                          Volume I
                          Pages 1 to 137
                          Exhibits 114 to 125
            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - -x
                              :
ARMOR SYSTEMS INTERNATIONAL,  :
INC.,                         :
            Plaintiff,        :
                              :   Civil Action
         vs.                  :   No. 05-10967 RCL
                              :
FIRST CHOICE BODY ARMOR &     :
EQUIPMENT,                    :
            Defendant.        :
                              :
- - - - - - - - - - - - - - - - - -x
```

        VIDEOTAPED DEPOSITION OF FIRST CHOICE BODY
ARMOR & EQUIPMENT, THROUGH ITS DESIGNEE EDWARD R.
DOVNER, AND EDWARD R. DOVNER INDIVIDUALLY, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Ken A.
DiFraia, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Scibelli, Whiteley & Stanganelli
LLP, 50 Federal Street, Boston, Massachusetts, on
Thursday, February 2, 2006, commencing at 1:54 p.m.
PRESENT:
     Stoel Rives LLP
          (by Steven T. Lovett, Esq.)

          900 S.W. Fifth Avenue, Suite 2600,

          Portland, OR 97204, for the Plaintiff.

     O'Connor & Associates

          (by John A. Leone, Esq.)

          100 State Street, Fourth Floor,

          Boston, MA 02109-2306, for the Defendant.

ALSO PRESENT:  Stephen Hartman, Videographer

                    * * * * *

Lovett Declaration
Exhibit C Pg 1

Page 54

1    A. If you wanted to, sure.
2    Q. Would First Choice do that? Is that in the
3 way you guys do your business, your practice to put
4 in bids for 16 Ford Excursion armored vehicles based
5 on a description that's in this amount of detail?
6    MR. LEONE: Objection. You can answer.
7    A. (Witness reviews document) If we could
8 refer to the second page, bottom paragraph.
9    Q. Sure.
10   A. It says, "You may submit your own
11 documentation forms as attachments." In a bid like
12 this, this could be bid just like this with us
13 suggesting what we would do to the vehicle, and what
14 could happen is they could send back and say, Well,
15 we want you to do this, this, this.
16      I'm not sure that that happened or didn't
17 happen with this, but I know we have done numerous
18 proposals where we have gotten suggestions like this
19 for bid and we have gone ahead and submitted what we
20 thought would be right to do to win the proposal.
21   Q. So in that circumstance, rather than
22 essentially KBR giving you the specs for the
23 product, you take a brief description of the
24 product, you give them the specs how you would fill

Page 55

1 it, and then they can come back and tell you, "Well,
2 tweak it here, and tweak it there"?
3    A. Based on the little knowledge that I had,
4 we had gotten information from several armor
5 companies to help us with that, because we really
6 didn't know much about armoring, so that could have
7 happened.
8    Q. Do you know if you put in a proposal in
9 response to this RFQ in June?
10   A. Possibly. I don't know. We would have to
11 go back and look and see.
12   Q. Do you know whether this is the 16 Ford
13 Excursion Project that brings us here today?
14   A. I don't know if this is the actual bid
15 document if this was the final one. I know there
16 were several changes made, addendums. I couldn't
17 answer that question.
18   Q. Is this the same project, is what I'm
19 asking.
20   A. Yes.
21   Q. I note Mr. Dreiling's E-mail there. Have
22 you had opportunities to exchange E-mails with
23 anyone at KBR relating to this project?
24   A. There were several E-mails I exchanged with

Page 56

1 KBR people on this project.
2    Q. Can you tell me which folks at KBR you
3 exchanged E-mails with.
4    A. Hoytt Runnels, two or three other people
5 that work or worked at KBR. I don't remember their
6 names.
7    Q. Were they also in the procurement area?
8    A. Inspection, two people were in inspection,
9 and one person was in the actual involvement of --
10 two in inspection -- and this is pertaining to
11 E-mails, correct?
12   Q. Yes, sir.
13   A. And one other person regarding the
14 transport of the vehicles.
15   Q. So am I correct in assuming that's quite a
16 bit later than June 2004. This is after the project
17 is already up. You already won the project, and you
18 were E-mailing the inspectors and the transporters?
19   A. That's correct.
20   Q. The folks, the two inspectors, do you
21 recall -- the two that relate to inspection -- we
22 don't know whether they were inspectors -- do you
23 recall the substance of those E-mails?
24   A. I don't. If you have the documents that I

Page 57

1 can look at, it would refresh my memory.
2    Q. Do you recall the subject matter of the
3 E-mails?
4    A. I don't. I don't recall that at this time.
5    Q. Do you recall when you exchanged the
6 E-mails with respect to -- I'm not asking a specific
7 date, of course, but I'm asking in the course of
8 events, was it after the first two vehicles had
9 shipped to Texas? Was it after all 16 had been
10 shipped? Do you know when you exchanged those
11 E-mails with the people in inspection?
12   A. That was after the first two vehicles --
13 before and after.
14   Q. Before and after the first two vehicles?
15   A. (Witness nods)
16   Q. Do you recall whether it related to the
17 condition of the first two vehicles?
18   A. That E-mail came from Mr. Runnels.
19   Q. About the condition of the vehicles?
20   A. Uh-huh.
21   Q. And that came to you directly?
22   A. Yes.
23   Q. So the two regarding the inspectors, those
24 didn't relate to the condition of the vehicles?

Page 58

```
1     A.  They did also, I'm pretty sure.
2     Q.  Do you recall any of the gestalt from it?
3     A.  Sorry?
4     Q.  Do you recall the general tenor of the
5  E-mails?  Were they complaining to you?  Were you
6  proposing how to make things up?
7     A.  Let me ask you if -- I'm not sure how you
8  are asking the question.
9     Q.  Sure.
10    A.  Are you asking me if I received E-mails
11 after the vehicles were received or before they were
12 received?
13    Q.  What you just told me, I believe, is that
14 you received E-mails from the two people in
15 inspection before and after the first two vehicles
16 had been received in Texas.
17    A.  Yes, that's correct.
18    Q.  What I'm asking you is do you remember
19 generally what those E-mails were about?
20    A.  I don't remember what the E-mails actually
21 said before we delivered, but I remember what the
22 E-mail said after the two vehicles were delivered.
23    Q.  What did the E-mail say after the two
24 vehicles were delivered?
```

Page 59

```
1     A.  That KBR was very dissatisfied with what
2  they saw.
3     Q.  Do you recall whether they detailed what
4  they were not satisfied with?
5     A.  I actually got a phone call after I got the
6  E-mail from Mr. Runnels on a Friday night --
7  sorry -- Saturday morning at my home on my cell
8  phone.
9     Q.  From Mr. Runnels?
10    A.  Uh-huh.
11    Q.  Did you respond to the E-mail from the
12 people in inspection, the ones that were sent after
13 the two vehicles were shipped to Texas?
14    A.  I don't remember.
15    Q.  They would be sent to your First Choice
16 E-mail account, right?
17    A.  Yes.
18    Q.  Do you have any insight for me on why those
19 were not produced in this case?
20    A.  I'm sorry?
21    Q.  Do you have any insight for me on why those
22 were not produced in this case?
23    A.  I don't know.
24    Q.  Would they still be on your system?
```

Page 60

```
1     A.  Possibly.
2     Q.  Do you maintain backup tapes of your
3  system?
4     A.  Yes.
5     Q.  Does your system have any automatic
6  deletion device where after a certain amount of
7  days, an E-mail --
8     A.  Yes.
9     Q.  Do you know how long the period is?
10    A.  About 30 days.
11    Q.  Then it goes into the deleted file?
12    A.  I don't know for sure.
13    Q.  Who at the company would know how your
14 system --
15    A.  Our IT person.
16    Q.  And that is?
17    A.  John Blackberg.
18    Q.  Blackberg?
19    A.  Uh-huh.
20    Q.  Obviously I'm going to show you some
21 documents, and we will walk through this to the best
22 extent we can.  What I want before that is your
23 present recollection as you sit here today of after
24 this RFQ was sent, did you propose based on this
```

Page 61

```
1  RFQ?  Did you send a proposal in response to
2  Exhibit 116?
3     A.  Define proposal, please.
4     Q.  Well, I think you used that term in terms
5  of what you guys go back to KBR with when you want
6  the work.
7     A.  Oh, okay.
8     Q.  Are we using the same term?
9     A.  Yes, and I'm not sure whether or not we did
10 that, but...
11    Q.  At some point, did you get any additional
12 materials from KBR relating to this project?
13    A.  Yes.
14    Q.  Did you get armoring specifications, do you
15 recall that?
16    A.  Yes.
17            (Document marked as Dovner
18            Exhibit 117 for identification)
19    Q.  I'm showing you Exhibit 117 to your
20 deposition, Mr. Dovner.  Please review that and tell
21 me if you recognize it.
22    A.  (Witness reviews document)
23    Q.  Have you had a chance to review it?
24    A.  Yes.
```

Page 134

1  to us, it was, "A few weeks," "A few weeks," "A few
2  weeks," every time. I called him sometimes five
3  times during the course of a week or seven times
4  during the course of a week. I don't remember
5  actually how many times, but it was a lot, to one
6  point where he didn't return my calls for almost
7  three weeks. He wouldn't return one of my calls,
8  which was very frustrating for me.
9        At that time it seemed as though ASI had
10  just developed a new product called their "tank
11  skin." We were just about to receive a huge
12  contract from the government.
13     Q.  Let me interrupt for a moment. We will get
14  to that. We will get to that. I want to focus --
15     A.  But I'm going to forget what I'm going to
16  tell you.
17     Q.  Go ahead if you want to go on. I mean, I
18  think you will remember the next time around. I am
19  pretty sure you will remember the tank skin thing.
20  I have seen it in your interrogatory responses.
21     A.  Okay, go ahead.
22     Q.  Was KBR upset to the point they expressed
23  frustration with Ford's delays?
24     A.  Yes.

Page 135

1     Q.  You agree with me, don't you, that you
2  can't armor a vehicle until it is delivered; isn't
3  that right?
4     A.  Yes.
5        MR. LOVETT: Let's go ahead and break.
6  It's almost 5:40.
7        THE VIDEOGRAPHER: The time is 5:39. This
8  is the end of Cassette No. 2. We are done for the
9  day. Off the record.
10        (Whereupon the deposition
11         was suspended at 5:39 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 136

1           C E R T I F I C A T E
2     I, EDWARD R. DOVNER, do hereby certify that I
3  have read the foregoing transcript of my testimony,
4  and further certify under the pains and penalties of
5  perjury that said transcript (with/without)
6  suggested corrections is a true and accurate record
7  of said testimony.
8     Dated at _____, this ____ day of _____,
9  2006.
10
11
12           _____
13
14
15
16
17
18
19
20
21
22
23
24

Page 137

1  COMMONWEALTH OF MASSACHUSETTS)
2  SUFFOLK, SS.              )
3     I, Ken A. DiFraia, Registered Professional
4  Reporter and Notary Public in and for the
5  Commonwealth of Massachusetts, do hereby certify
6  that there came before me on the 2nd day of Feb.,
7  2006, at 1:54 p.m., the person hereinbefore named,
8  who was by me duly sworn to testify to the truth and
9  nothing but the truth of his knowledge touching and
10  concerning the matters in controversy in this cause;
11  that he was thereupon examined upon his oath, and
12  his examination reduced to typewriting under my
13  direction; and that the deposition is a true record
14  of the testimony given by the witness.
15     I further certify that I am neither attorney or
16  counsel for, nor related to or employed by, any
17  attorney or counsel employed by the parties hereto
18  or financially interested in the action.
19     In witness whereof, I have hereunto set my hand
20  and affixed my notarial seal this ____ day of Feb.,
21  2006.
22        _____
23           Notary Public
24        My commission expires 4/3/09

Lovett Declaration

                                   Volume II
                                   Pages 2-1 to 2-134
                                   Exhibits 126 to 140
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - -x
                                    :
ARMOR SYSTEMS INTERNATIONAL,        :
INC.,                               :
              Plaintiff,            :
                                    :   Civil Action
         vs.                        :   No. 05-10967 RCL
                                    :
FIRST CHOICE BODY ARMOR &           :
EQUIPMENT,                          :
              Defendant.            :
                                    :
- - - - - - - - - - - - - - - - - -x

         CONTINUED VIDEOTAPED DEPOSITION OF FIRST
CHOICE BODY ARMOR & EQUIPMENT THROUGH ITS DESIGNEE
EDWARD R. DOVNER, AND EDWARD R. DOVNER INDIVIDUALLY,
a witness called on behalf of the Plaintiff, taken
pursuant to the Federal Rules of Civil Procedure,
before Ken A. DiFraia, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Scibelli, Whiteley & Stanganelli LLP, 50 Federal
Street, Boston, Massachusetts, on Friday, February
3, 2006, commencing at 9:44 a.m.
PRESENT:
     Stoel Rives LLP
          (by Steven T. Lovett, Esq.)
          900 S.W. Fifth Avenue, Suite 2600,

          Portland, OR 97204, for the Plaintiff.

     O'Connor & Associates

          (by John A. Leone, Esq.)

          100 State Street, Fourth Floor, Boston, MA

          02109-2306, for the Defendant.

     ALSO PRESENT:  Stephen Hartman, Videographer

                    *  *  *  *  *

Page 50

1  to you in my earlier testimony, that they had told
2  us that they only needed two people and we would get
3  three vehicles done a week. Then it went from three
4  people to two vehicles per week. I don't remember
5  the chronological order that I told you before, but
6  it was something like that.
7      It was told to me so many times that I felt
8  like a complete fool when I was in front of them
9  telling them this, because it didn't make us look
10 good at all.
11     Q. Did they know the dates on which Ford
12 delivered the vehicles?
13     A. Yes.
14     Q. And how did they know that?
15     A. When I had conversations with Mr. Runnels,
16 he had asked me how many vehicles were on the ground
17 at certain times. I verbally conveyed that to him
18 by calling Rodman and checking to make sure what was
19 coming in.
20     Q. So what you said was you were threatened,
21 and I don't understand what you mean by pay for your
22 own vehicles.
23     A. They were going to -- the vehicles that I
24 had purchased from Rodman Ford they were not going

Page 51

1  with kind of a monetary penalty?
2      A. Yes.
3      Q. What did they say?
4      A. I don't remember. I know that they said
5  there would be penalties, also.
6      Q. Tell me what you recall about that. I
7  mean, did they say, "If any more of these are late,
8  there is going to be a penalty"? What was the deal?
9      A. I don't remember exactly. Sorry, I don't
10 remember. It was a grueling meeting.
11     Q. Sure. Did you pay any penalties in this
12 deal?
13     A. Yes.
14     Q. What did you pay?
15     A. The contract was to do the work that ASI
16 should have done. That was a penalty.
17     Q. Let me stop you. Did you pay any penalties
18 to KBR?
19     A. I guess the biggest penalty we paid is that
20 we really lost our footing with them, and I don't
21 believe they really liked First Choice any longer
22 after what happened.
23     Q. You bet, and you are going to get a chance
24 to talk about that. What I'm talking about is a

Page 52

1  to pay me for and commandeered those vehicles, so
2  make me pay for them.
3      Q. Sorry, they were going to commandeer the
4  vehicles?
5      A. Take them, take the vehicles, the other
6  eight that hadn't been worked on.
7      Q. Was this a deal that they were asking for?
8      A. They said to me, "You are dealing with a
9  subcontractor for the government, and did you read
10 your contract? Do you know your contract?" I was
11 like, "No." "Did you know that we can take these
12 vehicles because this is wartime? Did you know that
13 this is an emergency?"
14     I said, "I know it's an emergency. I know
15 you need the vehicles." "If we want to, we can
16 invoke" some kind of power, I don't know, he read me
17 something. He said, "We can take these vehicles
18 from you if you don't produce." That really scared
19 me.
20     Q. And did you produce?
21     A. By sending the vehicles to CSI, yes, late.
22     Q. You produced, right?
23     A. (Witness nods)
24     Q. Did KBR threaten to penalize First Choice

Page 53

1  contract penalty. Are you familiar with contracts
2  that provide if things are delivered late, you pay a
3  penalty?
4      A. Yes.
5      Q. Did you pay any penalties to KBR?
6      A. Not that I can remember.
7      Q. Were you paid in full by KBR?
8      A. Yes.
9      Q. As far as KBR goes, you got paid 100 cents
10 on the dollar? You got all your profit?
11     A. No, I did not get all my profit.
12     Q. You got all your pay from KBR. You got the
13 exact amount you bargained for, correct?
14     A. I think so, yes.
15     Q. They didn't take any reduction, did they?
16     A. No.
17     Q. Isn't it true that what they said was, "You
18 got to get this done right and get it done now or
19 else we're going to change the project"? Wasn't
20 that essentially the message?
21     A. What they had said to me was what I said
22 earlier, sir. When I was in the meeting, they told
23 me I needed to find another contractor, basically
24 referring to that or inferring that, that I needed

1    Q.  What I'm asking is you think he's no longer
2  there, you, Eddie?
3    A.  Well, when I call there, he's not there.
4    Q.  Have you asked for him and they say, "He's
5  no longer here"?
6    A.  Yes.
7    Q.  Well, that --
8    A.  I'm sorry.
9    Q.  Do you recall about when that was?
10    A.  Sometime after this project was over with.
11    Q.  You've produced in this case a series of
12  KBR requests for quotations and a couple of purchase
13  orders, and at some point they seem to be all
14  issuing out of Mr. Runnels, and then they change to
15  a more difficult name, Fayyaz Sarwar?
16    A.  Yes.
17    Q.  Does that sound familiar?
18    A.  Yes.
19    Q.  Is it your understanding that Mr. Sarwar
20  replaced Mr. Runnels as --
21    A.  I think so, yes.
22    Q.  As procuring those kinds of products?
23    A.  Yes.
24    Q.  Is he still with the company, as far as you

1    Q.  Sure.  How often do you use E-mail?
2    A.  Sometimes.
3    Q.  Sometimes several times a day, sometimes
4  not for a couple of days?
5    A.  Sometimes, right, yes.
6    Q.  Was your E-mail reviewed for production in
7  this case?
8    A.  I don't understand the question, sir.
9    Q.  We requested all documents relating to the
10  Ford Excursion Project, right?
11    A.  Yes, sir.
12    Q.  And your company, I assume, turned over to
13  your lawyer documents relating to that?
14    A.  Yes, sir.
15    Q.  What I'm asking is whether your E-mail, in
16  fact, the whole company's E-mail system was searched
17  relating to E-mails relating to the project?
18    A.  We were asked to do that, sir, yes.
19    Q.  Did you do that?
20    A.  Yes, sir.
21    Q.  Can you explain why none were produced?
22    A.  Maybe there were no E-mails.  I don't know.
23  I can't answer that.
24    Q.  Well, you testified yesterday there were

1  know?
2    A.  I don't know.  I've called him several
3  times, and he doesn't return my calls.
4    Q.  Again, you produced in this case a purchase
5  order from KBR relating to vests.  The purchase
6  order was November 2005, okay?
7    A.  Yes.
8    Q.  That at the time was the most recent work
9  you had gotten from KBR, okay?
10    A.  Yes.
11    Q.  That was a little while ago.  I want to ask
12  whether you have gotten any further orders from KBR
13  since November?
14    A.  I would have to go back and look.  I'm not
15  sure.
16    MR. LOVETT:  We will request that that be
17  updated, please.
18    Q.  Have you put in other bids since then?
19    A.  Yes.
20    Q.  Did you exchange E-mail with Mr. Mundo at
21  CSI?
22    A.  I can't be sure.  If you have some
23  documents I could look at, I would more than happy
24  to, if you could refresh my memory.

1  E-mails relating to the project.
2    A.  There might have been.  I don't recall.
3    Q.  I'm going to request that we look for
4  backup tapes and otherwise look into the system
5  here.  It seems to me extremely unlikely that
6  there's nothing remaining just a few months after
7  the contract ended.  Because we asked for these
8  documents a long time ago.
9    MR. LOVETT:  In fact, when you get in
10  litigation, John, as you know -- let me just
11  finish -- you have a duty as a party to the
12  litigation to preserve evidence.
13    What we have heard over the last couple of
14  days was there were E-mails sent relating to this
15  project, E-mail regarding the inspection of the
16  vehicles, E-mail regarding CSI, and none of those
17  have been produced.
18    We instituted this action before the
19  project was over.  I think we have a real issue here
20  if we can't get those E-mails.
21    MR. LEONE:  We will do so.  We will search
22  for any backup tapes.
23    I do know that a search was conducted.  I
24  believe that we did produce some amount of E-mail in

Page 78

1 our document production. I don't believe it was
2 completely absent from any E-mails, but yes, we will
3 look for any backup tapes. We will produce any
4 E-mails we can locate.
5        MR. LOVETT: For the record, I think the
6 E-mails produced came from O'Connor & Associates
7 relating to this, rather than from First Choice, but
8 obviously whatever was produced was produced.
9    Q.  Were you instructed at the time this action
10 was filed to preserve all evidence, communications
11 relating to the project?
12    A.  Yes, sir.
13    Q.  And did you do so?
14    A.  Yes, sir.
15    Q.  Did you instruct others at First Choice to
16 do so?
17    A.  To pull every E-mail, to take everything
18 that they had and print it.
19    Q.  And you did the same thing yourself?
20    A.  Whatever we had.
21    Q.  I want to focus now on First Choice's
22 assertion that it has been damaged by ASI's
23 performance on the Ford Excursion Project as it
24 relates to KBR, okay?

Page 79

1    A.  Explain that to me, please.
2    Q.  I'll try. My understanding -- and I can
3 give you an exhibit here -- is that you essentially
4 have two different kinds of damages you allege you
5 suffered. One is your kind of out-of-pocket losses.
6 You paid CSI. You had to buy steel. You had to pay
7 AMC. You had to pay Mark's Upholstery. You have a
8 whole stock of invoices relating to that?
9    A.  Yes, sir.
10    Q.  Your contention, I assume, is all of that
11 should have been done by ASI. The fact that you had
12 to pay for it, they should pay for it instead of
13 you?
14    A.  Yes, sir.
15    Q.  The other part of your damages, as I
16 understand it, is that you contend that you've lost
17 business.
18    A.  Yes, sir.
19    Q.  With KBR?
20    A.  Yes, sir.
21    Q.  That's what I want to focus on.
22    A.  Okay.
23    Q.  What is the basis for that element of
24 damage?

Page 80

1    A.  The relationship that took me over a year
2 to cultivate deteriorated after Vehicles 1 and 2
3 were delivered.
4        I used to get return phone calls
5 immediately from Mr. Bunnels on information about
6 what they liked about our vests, or if we lost a
7 bid, did we lose because of price, did we lose
8 because of accessories that were added. That
9 stopped happening.
10        When I called him again, his voice had
11 changed, just not the same relationship, and we to
12 regain their confidence bid products, First Choice
13 products, lower than what we would have bid if this
14 hadn't happened, and we still didn't get orders.
15        I felt like we were frozen out, that First
16 Choice was a nasty word in the KBR/Halliburton
17 world.
18    Q.  When do you believe that confidence was
19 lost?
20    A.  After Vehicles 1 and 2 was delivered.
21    Q.  When did you start bidding projects lower
22 than you might otherwise have bid them?
23    A.  While this was all happening.
24    Q.  After Vehicles 1 and 2 were delivered?

Page 81

1    A.  Yes.
2    Q.  Exhibit 126 to your deposition, and what I
3 want you to focus on is Interrogatory No. 9 and the
4 answer to Interrogatory No. 8. That's what we're
5 talking about here.
6        (Document marked as Dorner
7        Exhibit 126 for identification)
8    A.  (Witness reviews document)
9    Q.  Have you finished reviewing Interrogatory
10 No. 8 and the response to Interrogatory No. 8?
11    A.  I couldn't even begin to answer that. I
12 would have to have every single bid in front of me
13 and look at every single bid. Even if I looked at
14 them, I don't know if I could recall the question
15 that you are asking me here.
16    Q.  Actually, all I'm doing is asking you to
17 review Interrogatory No. 8 and the answer. Then I
18 will ask you about the answer.
19    A.  Okay. I'm sorry. (Witness reviews
20 document) Okay.
21    Q.  At the very end of the answer, it says
22 that, "Excepting the two bids awarded to FCA, FCA
23 has no knowledge or information as to the identity
24 of the entities who were awarded the bids or the

Page 94

```
1          (Document marked as Dovner
2          Exhibit 129 for identification)
3     Q.  I'm showing you Exhibit 129 to your
4  deposition. Please review it. The question is
5  going to be as I show you each of these documents,
6  can you tell me whether First Choice lost this
7  project or, I should say, did not win this project
8  because of ASI's performance on the Ford Excursion
9  Project.
10         That's going to be my question with respect
11 to each one of these, okay?
12    A.  You want me to answer?
13    Q.  Yes.
14    A.  My answer to you is that I'm positive that
15 we lost contracts. I can't determine which ones. I
16 know that we were frozen out. I know the
17 relationship was extremely strained, and you can
18 show me every one of them and I will tell the same
19 thing to save you some time. I know in my heart
20 that that's what happened.
21    Q.  I appreciate that. What I want to make
22 sure is we're clear on the record that you don't
23 have any way of knowing which project you lost
24 because of that?
```

Page 96

```
1  Excursion Project?
2     A.  Potentially every one.
3     Q.  I understand "potentially," but I want to
4  know which ones you lost. You are suing my client
5  because you lost business. I want to know what's
6  the business you lost.
7     A.  Again, I'll repeat myself to the best of my
8  ability. We had a very strong relationship with our
9  customer which diminished very quickly because of
10 what happened and because of ASI's actions, and we,
11 or me personally, handling this account and talking
12 to the people that made the decisions at that
13 location, that ended. And I don't believe that if
14 we practically gave them stuff for nothing, we would
15 have won anything from them.
16    Q.  Of course, you have won a couple of things
17 with them, correct?
18    A.  We have won the one sole source that we had
19 made for them that they had never seen before.
20    Q.  You just talked about talking to people at
21 KBR, some conversations you had with people at KBR,
22 that, they told that you didn't win particular
23 projects because of ASI's performance on the Ford
24 Excursion Project?
```

Page 95

```
1     A.  No.
2     Q.  What I just said is correct?
3     A.  I would say that, again, there were several
4  projects that we bid on that we were positive -- we
5  were so low. Based on looking back at what we had
6  lost and what we had won, we were able to look and
7  see there was no way we could have lost this.
8  That's my answer.
9     Q.  With respect to those particular bids, can
10 you tell me as you sit here today that First Choice
11 lost those bids because of the performance of ASI on
12 the Ford Excursion Project?
13    A.  I absolutely believe that.
14    Q.  And what's the basis for that belief?
15    A.  Because of the relationship that I had that
16 I know longer have and the not returned phone calls,
17 the short conversations, the no more joking. Just
18 everything went cold.
19    Q.  I understand you believe that the
20 relationship went cold and it cost you some bids,
21 but what I'm trying get at is you can't -- and we
22 can go through each one of these. but are you going
23 to be able to tell me which one of these RFQ's you
24 lost because of ASI's performance on the Ford
```

Page 97

```
1     A.  Mr. Runnels at one point had said to me,
2  "The people here are not happy with you," or he
3  inferred that, "We're not happy." Again, I don't
4  know the exact wording that he used, but they were
5  not happy with what happened.
6     Q.  Can you tell me when he made that
7  implication.
8     A.  In several phone calls, it was heard in his
9  voice, made comments. When he had called me
10 Saturday at home to go to Houston on Monday morning,
11 he had said that, "We have trouble here. We have
12 problems."
13    Q.  Other than the discussions you just
14 described with Mr. Runnels, is there any other
15 communication with KBR that supports your belief
16 that First Choice didn't get KBR work because of
17 ASI's performance on the Ford Excursion Project?
18    A.  I'm sure there are more that I can't think
19 of right now.
20    Q.  Just to get back to these RFQ's, let me
21 make sure I have your testimony correct. You are
22 not going to be able to tell me by reviewing the
23 requests for quotations that your client -- that
24 First Choice submitted, whether a particular project
```

Page 134

1  COMMONWEALTH OF MASSACHUSETTS)
2  SUFFOLK, SS.                    )
3      I, Ken A. DiFraia, Registered Professional
4  Reporter and Notary Public in and for the
5  Commonwealth of Massachusetts, do hereby certify
6  that there came before me on the 3rd day of Feb.,
7  2006, at 9:44 a.m., the person hereinbefore named,
8  who was by me duly sworn to testify to the truth and
9  nothing but the truth of his knowledge touching and
10  concerning the matters in controversy in this cause;
11  that he was thereupon examined upon his oath, and
12  his examination reduced to typewriting under my
13  direction; and that the deposition is a true record
14  of the testimony given by the witness.
15      I further certify that I am neither attorney or
16  counsel for, nor related to or employed by, any
17  attorney or counsel employed by the parties hereto
18  or financially interested in the action.
19      In witness whereof, I have hereunto set my hand
20  and affixed my notarial seal this _____ day of Feb.,
21  2006.
22              _____
23              Notary Public
24          My commission expires 4/3/09

Volume I
Pages 1 to 30
Exhibits 157-159
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                     :
ARMOR SYSTEMS INTERNATIONAL,  :
INC.,                      :
        Plaintiff,       :
                      :
      vs.              :  Civil Action
                      :  No. 05-10967 RCL
FIRST CHOICE BODY ARMOR &   :
EQUIPMENT,               :
        Defendant.       :
                      :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF JOHN C. BLACKBERG, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Anne H.
Bohan, Registered Diplomate Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Scibelli, Whiteley and Stanganelli
LLP, 50 Federal Street, Boston, Massachusetts, on

Tuesday, March 28, 2006, commencing at 2:47 p.m.

PRESENT:

    Stoel Rives LLP

        (by Steven T. Lovett, Esq.)

        900 S.W. Fifth Avenue, Suite 2600,

        Portland, OR 97204, for the Plaintiff.

    O'Connor & Associates

        (by John A. Leone, Esq.)

        100 State Street, Fourth Floor,

        Boston, MA 02109-2306, for the Defendant.

               * * * * *

Page 2

I N D E X

WITNESS                    DIRECT    CROSS

JOHN C. BLACKBERG

BY MR. LOVETT                3

* * * *

E X H I B I T S

NO.        DESCRIPTION                PAGE

157    E-mail chain, the top e-mail being    24
       dated October 22, 2004, to Anne
       Sullivan from Bob Marciano, Bates
       Nos. 000832-833

158    E-mail chain, the top e-mail being    24
       dated February 17, 2005, to Edward
       Dovner from Terry Billedeaux

159    E-mail dated February 16, 2005, to    25
       Eddie Dovner from Terry Billedeaux

* * * *

Page 4

1    A.  No, I have not.
2    Q.  Let's just go over what's going to happen
3  today.  You're represented today by Mr. Leone,
4  correct?
5    A.  Correct.
6    Q.  I am going to ask you questions and you are
7  going to give us your best present recollection of
8  events, your best knowledge.  You're not to guess at
9  answers.  If you don't understand any question I
10 ask, will you please commit to tell me that?
11   A.  Um-hum.
12   Q.  You need to verbalize your answers.
13   A.  Yes.
14   Q.  And if you answer a question, I'm going to
15 assume that you understood the question.  Fair
16 enough?
17   A.  Yes.
18   Q.  If you need a break at any time -- it
19 should be a short deposition, but if you need a
20 break at any time, just let us know.  Okay?
21   A.  Thank you.
22   Q.  What is your current employment, please?
23   A.  My current employment is with First Choice
24 Armor in Brockton, Massachusetts.

Page 3

1        P R O C E E D I N G S
2      MR. LEONE:  Usual stipulations, 30 days to
3  read and sign.
4          JOHN C. BLACKBERG
5  a witness called for examination by counsel for the
6  Plaintiff, having been satisfactorily identified by
7  the production of his driver's license and being
8  first duly sworn by the Notary Public, was examined
9  and testified as follows:
10       DIRECT EXAMINATION
11 BY MR. LOVETT:
12   Q.  Good afternoon, Mr. Blackberg.  I'm Steve
13 Lovett, I represent Armor Systems International in
14 this case.
15       Would you please state your name for the
16 record.
17   A.  John Charles Blackberg.
18   Q.  Spell your last name for us.
19   A.  B-l-a-c-k-b-e-r-g.
20   Q.  What is your home address, please?
21   A.  15 Harrod Ave., Brockton, Massachusetts
22 02301.
23   Q.  Have you ever had your deposition taken
24 before?

Page 5

1    Q.  What do you do at First Choice?
2    A.  I am their ISO manager, their IT manager,
3  their CAD operator, and actually multi other
4  functions.
5    Q.  What does "ISO" stand for?
6    A.  ISO is a standardization quality assurance
7  program.
8    Q.  What does "IT" stand for?
9    A.  Information technology.
10   Q.  And did you say you are the manager of CAD
11 operation, or you are the CAD operator?
12   A.  I'm just one of the CAD operators; I'm
13 filling in at the moment.
14   Q.  Are there more than one CAD operators
15 employed by --
16   A.  Yes, there are two others.
17   Q.  You need to try to wait until my question
18 is over.  My questions can get kind of long, so just
19 try and be patient.
20       There are two other operators; is that what
21 you said?
22   A.  Correct.
23   Q.  Can you give us a sense about what
24 percentage of the time you spend on IT as opposed to

Page 6

```
 1   the other roles you play.
 2      A.  At this point in time my IT role is
 3   probably about 15 percent of my daily routine.
 4      Q.  Is there anyone else who is involved in IT
 5   management?
 6      A.  Negative.
 7      Q.  Now you say "at this point in time."  Had
 8   it been a higher percentage previously?
 9      A.  Correct.
10      Q.  Why don't you just -- let me back up.  How
11   long have you been IT manager?
12      A.  Six to eight months.
13      Q.  Was there an IT manager before you?
14      A.  No.
15      Q.  Did you work -- when did you start working
16   at the company?
17      A.  Four years ago April 2nd.
18      Q.  So let's start with when you joined the
19   company.  What was your position then?
20      A.  Shipping/receiving.
21      Q.  So you worked on the loading dock
22   essentially?
23      A.  Yes.
24      Q.  And how long was that your position?
```

Page 7

```
 1      A.  Two weeks.
 2      Q.  What did you do next?
 3      A.  I was production manager.
 4      Q.  What does a production manager do?
 5      A.  Who controls the flow of production
 6   throughout the company, is in charge of the cutting
 7   department, the CAD department and multi other
 8   functions.
 9      Q.  How long was that your position?
10      A.  Three and a half, three years.
11      Q.  Was that your position right up until you
12   became IT manager?
13      A.  Correct.
14      Q.  You became IT manager, you said, six to
15   eight months ago.  Before you became IT manager, did
16   you have any role in working with the computer
17   system throughout the company?
18      A.  Yes.
19      Q.  What did you do?
20      A.  I was kind of like a help person, I just
21   happened to have the information that people needed
22   to help.  I'd help someone in Word or Excel, because
23   I had worked in that area before.
24      Q.  When you became IT manager, did you
```

Page 8

```
 1   relinquish the production manager position?
 2      A.  Negative.
 3      Q.  So you retained that position?
 4      A.  Yes.
 5      Q.  For how long?
 6      A.  Six more months.
 7      Q.  So only very recently did you stop being
 8   production manager?
 9      A.  Yes.
10   *Q.  When did you become ISO manager?
11      A.  Around the same time as I became IT
12   manager.**
13      (An interruption)
14      MR. LOVETT:  Could you read back the
15   question and answer.
16      (Record read * to **)
17      Q.  Was there a particular event that
18   precipitated you becoming IT manager?
19      A.  A new production manager was brought in,
20   and I was asked to take on a different role in the
21   company, which a job was kind of created as ISO/IT
22   and I still helped in the production area as needed.
23      Q.  So does First Choice have a server?
24      A.  Yes.
```

Page 9

```
 1      Q.  What's the server?  What's the nature of
 2   the server?
 3      A.  We have several servers.
 4      Q.  Tell me which ones you have.
 5      A.  We have an e-mail server, two
 6   fileservers -- actually, I apologize, three
 7   fileservers.  And that's it.
 8      Q.  As IT manager, what is your responsibility
 9   with respect to the servers?
10      A.  Maintaining their up status, if anybody has
11   problems.  It's mostly -- it's kind of a glorified
12   title; it's mostly helpdesk.  If people need help, I
13   help them.  If the servers need upgrades, I upgrade
14   them.  For the most part, I have a company that
15   works for me that I bring in to do most of the major
16   work.
17      Q.  So when there's some kind of a rebuilding
18   or updating that's done, it's the outside company
19   that comes in and does it?
20      A.  Correct.
21      Q.  Has First Choice had the same e-mail server
22   -- back up.  How long has First Choice had the
23   e-mail server it currently has?
24      A.  As long as I've been there.
```

Page 10

1    Q.  How many people of the company are users of
2  e-mail?
3    A.  Can I guess?
4    MR. LEONE:  No, don't guess.
5    Q.  You tell us you're approximating, you can
6  say that, give us a range.
7    A.  I'm approximating 35.
8    Q.  Around 35?
9    A.  Correct.
10    MR. LEONE:  Let me remind you, don't try to
11  talk over counsel, because it makes the court
12  reporter's life difficult trying to take down two
13  people speaking at the same time.
14    A.  I apologize.
15    Q.  Do those 35 include yourself?
16    A.  Yes.
17    Q.  Are these sales -- is the sales staff on
18  e-mail?
19    A.  Yes.
20    Q.  So Ryan Dovner has e-mail, for example?
21    A.  Yes.
22    Q.  Are you responsible for training people to
23  use the system at First Choice?
24    A.  Responsible, no, but I do, I help.

Page 11

1    Q.  It's not an assigned responsibility, but
2  you're there to help?
3    A.  Correct.
4    Q.  Please state the highest level of education
5  you've reached.
6    A.  GED.
7    Q.  What year did you obtain that?
8    A.  I don't remember.
9    Q.  How old are you?
10    A.  38.
11    Q.  Before you joined First Choice, what did
12  you do?
13    A.  I worked for Slade Gorton & Company.
14    Q.  What did you do?
15    A.  The same boat, I was actually their IT
16  manager.
17    Q.  How long were you IT manager at -- what did
18  you say the name of the company was?
19    A.  Slade Gorton, S-l-a-d-e G-o-r-t-o-n.  About
20  four years.
21    Q.  Isn't that the name of a senator or
22  something?
23    A.  Actually, it is.
24    Q.  So you were IT manager at Slade Gorton for

Page 12

1  four years?
2    A.  Approximately four years.
3    Q.  What employment did you have before being
4  IT manager at Slade Gorton?
5    A.  I worked for them for 17 years.  The same
6  as First Choice, I worked my way from the bottom to
7  that area.
8    Q.  Why did you leave Slade Gorton?
9    A.  I was let go.
10    Q.  What were the reasons?
11    A.  There was a reshuffling of the IT
12  department.  Kind of the higher-paid employees were
13  let go.
14    Q.  And you joined First Choice shortly after
15  leaving Slade Gorton?
16    A.  About six months, yes.
17    Q.  That six-month period you were essentially
18  unemployed?
19    A.  Correct.
20    Q.  Have you any experience with litigation
21  discovery?
22    A.  No.
23    Q.  Have you ever been convicted of a crime?
24    A.  Yes.

Page 13

1    Q.  What crime was that and when was it?
2    A.  Breaking and entering when I was 17.
3    Q.  Was that a felony, do you know?
4    A.  I don't believe so.
5    Q.  At least what you ended up being convicted
6  of was not a felony?
7    A.  No, it was not a felony.
8    Q.  Any others?
9    A.  No.
10    Q.  With respect to your e-mail server, what is
11  the make of the server, the make and model kind of
12  thing?
13    A.  I do not know.
14    Q.  You don't know who the manufacturer is?
15    A.  No.  I believe it was built.
16    Q.  Excuse me?
17    A.  I believe it was built from scratch.
18    Q.  Do you have Outlook, for example?
19    A.  Yes.
20    Q.  Has the company had Outlook since you've
21  been there?
22    A.  Yes.
23    Q.  Does the company have an e-mail retention
24  policy?

Page 14

1    A.  Not that I'm aware of.
2    Q.  Is there any practice that's followed
3  generally in the company with respect to retaining
4  e-mails or deleting e-mails?
5    A.  On an individual basis.
6    Q.  So it's up to the individual discretion of
7  the employee?
8    A.  Correct.
9    Q.  Just to make sure I've got this right.  So
10  you're deleting e-mails all the time, as all of us
11  do.  Is there some point where the server takes out
12  the older deleted e-mails?
13    A.  No.
14    Q.  So then I'm correct, aren't I, the only way
15  to permanently delete an e-mail at First Choice is
16  to delete a deleted e-mail?
17    A.  Correct.
18    Q.  Does First Choice keep backup tapes?
19    A.  We do, yes.
20    Q.  Would you walk me through what your system
21  is.  People do it differently.  Do you have a backup
22  tape every day?  Yes?
23    A.  Yes.
24    Q.  You do.  And how much of the system is

Page 15

1  backed up every day?
2    A.  The entire database of the e-mail is backed
3  up every day.
4    Q.  How many tapes do you use to back up the
5  e-mail?  Do you rotate five?
6    A.  Five.
7    Q.  Is there any other backup tape created?
8    A.  No.
9    Q.  So do you have any archival backup tapes?
10    A.  No.
11    Q.  Do you back up the entire system at any
12  point?
13    A.  No.
14    Q.  So all you do is a daily backup of e-mail,
15  correct?
16    A.  Correct.
17    Q.  And it's just five days a week, and then
18  you start on day six, it's tape one again, right?
19    A.  Correct.
20    Q.  At any point were you instructed to
21  preserve electronic files relating to this case?
22    A.  No, nor would I have been.
23    Q.  What do you mean by that?
24    A.  The users would back up their own at that

Page 16

1  point.  I only preserve the database itself.
2    Q.  Do you know whether -- are you an e-mail
3  user yourself?
4    A.  Yes.
5    Q.  Were you instructed to preserve your
6  electronic files?
7    A.  No.
8    Q.  Do you know whether anyone at the company
9  was instructed to preserve their electronic files?
10    A.  Not that I'm aware of, no.
11    Q.  Have you had any role in searching your
12  system for e-mail or other documentation relating to
13  this litigation?
14    A.  Yes.
15    Q.  When did you first take part in that?
16    A.  The 16th of August, I believe.
17    Q.  What did you do on the 16th of August?
18    A.  I was sent an e-mail from Mr. Leone to
19  Eddie to me in regards to looking for e-mails that
20  had to do with ASI, KBR.  And in that e-mail it gave
21  the fact that they had already had a certain set of
22  e-mails and I started -- I had to look for dates
23  from that point forward.
24    Q.  Do you recall what the date was?

Page 17

1    A.  Not at this time, no.
2    Q.  When you say they already had a certain
3  date of e-mails, what do you mean by that?
4    A.  In the e-mail I read, it just stated they
5  had a certain amount of e-mails already and then
6  they wanted to see after that.
7    Q.  As of a given date?
8    A.  Correct.
9    Q.  So like as of May 1, 2005, something like
10  that?
11    A.  Yes.  I went to Eddie for clarification,
12  and I honestly don't remember, it was a verbal
13  conversation, as to what date forward to look for.
14    Q.  In any event, you didn't go back before
15  that particular date?
16    A.  Correct.
17    Q.  What did you do to try and locate those
18  e-mails?
19    A.  I did a keyword search in four people's
20  e-mail accounts, in their inbox and personal
21  folders.
22    Q.  Who are the four people?
23    A.  Anne Sullivan, Eddie Dovner, Kim Sawyer and
24  Kevin McNamara.

Page 18

1    Q.    What's Mr. McNamara's position at First
2  Choice?
3    A.    I don't know his official position, but he
4  works in accounting.
5    Q.    How about Kim Sawyer; what's her position?
6    A.    Kim Sawyer is a management assistant.
7    Q.    Whose assistant is she?
8    A.    Eddie's.
9    Q.    What's Anne Sullivan's position?
10    A.    She also works in accounting.
11    Q.    Is one of them the accounting manager, or
12  is there an accounting manager, better question?
13    A.    That would be Kevin.
14    Q.    I think you testified that you did an
15  e-mail search.
16    A.    A keyword search.
17    Q.    A keyword search.  Do you recall what
18  keywords you used?
19    A.    ASI, CSI and KBR.  The scope was limited,
20  because I wasn't aware of the actual reason why I
21  was looking for them.
22    Q.    Sure.  I assume the terms were provided to
23  you?
24    A.    Yes.

Page 19

1    Q.    What did you locate, do you recall?
2    A.    I found three or four e-mails that had to
3  do with different bids going back and forth to KBR
4  and none of them had anything to do with the
5  vehicles, that I could tell again.  I did not read
6  them.  So they didn't fall into the criteria I was
7  looking for.
8    Q.    Did you find anything with respect to CSI?
9    A.    No.
10    Q.    Did you find anything with respect to ASI?
11    A.    No.
12    Q.    You said you did an e-mail search.  Explain
13  to me, when you put a keyword in there to search
14  e-mail, what is it actually searching?
15    A.    It's searching the subject and for the
16  keyword in the body of the e-mail.
17    Q.    Is it all e-mail on the system regardless
18  of whether it's deleted or sent?
19    A.    No.  I checked their inboxes, their deleted
20  items boxes, and their sent items folders.
21    Q.    Could you do that all at once?
22    A.    No.  I actually had to go to the individual
23  boxes.
24    Q.    Did you search anything other than those

Page 20

1  three boxes for the four people you mentioned?
2    A.    No.
3    Q.    Subsequent to that have you performed any
4  other -- have you made any other efforts to locate
5  documents in this case?
6    A.    No.
7    Q.    Who is Damita Godfrey?
8    A.    Damita Godfrey used to work for the
9  accounting department before Kevin came in.
10    Q.    With respect to the three or four e-mails
11  that you found relating to bids for KBR, on whose
12  system did you find them?
13    A.    That was on Kim Sawyer's.
14    Q.    I assume you provided that information to
15  Mr. Dovner?
16    A.    No.  There was nothing in there about
17  vehicles.  I did a quick search for vehicles,
18  Explorer, through those particular e-mails, and none
19  of them reached the criteria.  When I did report to
20  Eddie I did state I found three e-mails that were
21  not related.
22    Q.    Not related to the vehicles?
23    A.    Correct.
24    Q.    I think I asked you this, but I want to

Page 21

1  make sure I got it down.  Have you made any other
2  efforts with respect to the electronically stored
3  material at First Choice to try and locate
4  documents, information related to this litigation?
5    A.    No.
6    Q.    Did you have any role in -- let me back up.
7  I am correct that you did not search separately held
8  files somebody might have in their archived files?
9    A.    Personal folders and archived files, no, I
10  did not.
11    Q.    We've just received recently some e-mail
12  that has Damita Godfrey's name on it.  Did you have
13  any role in finding that e-mail?
14    A.    No, I did not.  That was Anne Sullivan.
15    Q.    That was my next question.  Thank you.
16        Do you know how Ms. Sullivan found those
17  e-mails?
18    A.    Yeah.  After I discovered this, I
19  remembered that when an employee leaves and another
20  employee takes his or her place, what we try to do
21  is keep their e-mail accounts live and active for a
22  couple of months.  What we do is we point in the
23  background, we forward their e-mails to the new
24  person's account, and that new person just probably

Page 26

```
1    font.
2        A.   That's what I'm trying to see.
3        Q.   I think it's actually a different font.
4    I'll represent to you, they're exactly the same.
5        A.   Okay.
6        Q.   Except for the time difference.
7        A.   The time difference, yeah.
8        Q.   Now, you see three e-mails on Exhibit 158.
9        A.   Yes.
10       Q.   Can you tell us which one was sent first,
11   second, and which was the most recent?
12       A.   From these three here.
13       Q.   Right.  The bottom one first, the middle
14   one second, and the top one was the third one sent.
15       A.   That doesn't make sense to me.  Typically
16   e-mail graduates to its oldest date is on the top.
17   This doesn't make sense to me.
18       Q.   Its oldest date is on the top?
19       A.   I'm sorry.
20       Q.   The most recent?
21       A.   The most recent date is on the top.
22       Q.   And the reason it doesn't make sense to you
23   is what?
24       A.   This one says it's 2:30 p.m.; then it goes
```

Page 27

```
1    to 2:15 p.m.
2        Q.   When Mr. Dovner received Mr. Billedeaux'
3    e-mail from the West Coast, when it showed up on Mr.
4    Dovner's machine, that received e-mail is dated and
5    timed according to what date and time?
6        A.   I'm assuming that it is the time that it
7    was sent from Mr. Billedeaux.
8        Q.   What time was it sent from Mr. Billedeaux,
9    East Coast time or Pacific Coast time?
10       A.   I do not know.
11       Q.   Just to make sure we're clear, in your
12   experience, when you print out e-mail, typically the
13   one at the very top of the document is the most
14   recent?
15       A.   Correct.
16       Q.   And then the second one is the second-most
17   recent, et cetera, all the way back to the first
18   one?
19       A.   Correct.
20       MR. LOVETT:  Let's go off the record for a
21   second.
22       (A pause)
23       MR. LOVETT:  Go back on the record, please.
24       Q.   Have you ever reviewed any files on Mr.
```

Page 28

```
1    Dovner's computer other than inbox, sent and
2    deleted?
3        A.   No.
4        MR. LOVETT:  That's all I have.  Thank you.
5    I appreciate your time.
6        THE WITNESS:  Not a problem.
7        (Deposition concluded at 3:18 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 29

```
1            C E R T I F I C A T E
2        I, John C. Blackberg, do hereby certify that I
3    have read the foregoing transcript of my testimony,
4    and further certify under the pains and penalties of
5    perjury that said transcript (with/without)
6    suggested corrections is a true and accurate record
7    of said testimony.
8        Dated at _____, this ____ day of _____,
9    2006.
10
11
12       _____
13
14
15
16
17
18
19
20
21
22
23
24
```

Lovett Declaration
Exhibit E  Pg 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
05-10967-RCL

ARMOR SYSTEMS                )
INTERNATIONAL, INC.          )
                             )
        Plaintiff,           )
                             )
v.                           )
                             )
FIRST CHOICE BODY ARMOR &    )
EQUIPMENT, INC.              )
                             )
        Defendant.           )

## SUPPLEMENTAL ANSWERS
## OF FIRST CHOICE ARMOR & EQUIPMENT, INC.

The defendant, First Choice Armor & Equipment, Inc. (hereinafter, "First Choice"), hereby responds to plaintiff's interrogatories, subject to the following general and specific objections. By furnishing an answer to any interrogatory, First Choice does not waive any of its general or specific objections to that or any other interrogatory.

### GENERAL OBJECTIONS

1.   First Choice objects generally to all of plaintiff's interrogatories insofar as they seek discovery of matters which constitute privileged communications or materials prepared in anticipation of litigation or trial.

2.   First Choice objects generally to all of plaintiff's interrogatories to the extent they seek to impose any objection greater than that mandated by Fed.R.Civ.P. 26 and the Local Rules thereunder.

3.   First Choice states that the following answers are being furnished preliminary and without the benefit of prior discovery. First Choice reserves the right to supplement its answers as further investigation and discovery proceed.

RECE_/ED
STOEL RIVES LLP
By _____

## INTERROGATORY NO. 1

Describe in detail the status of the Ford Excursion Project including but not limited to the status of armor installation, vehicle deliveries to KBR, vehicle acceptances by KBR (if any of the vehicles have been rejected by KBR, the reasons given for each rejection), and payments you have received.

## ANSWER NO. 1

The Ford Excursion Project is complete, notwithstanding the extraordinary problems created by ASI and associated product rejections. First Choice was forced to use another vendor to complete the project. First Choice has now been paid in full from KBR.

## SUPPLEMENTAL ANSWER NO. 1

The defendant states that it contracted with CSI in Miami, Florida to complete the project. After completion by CSI, all sixteen vehicles were accepted by KBR. First Choice received a total of 1.6 million dollars in payment from KBR.

### VERIFICATION

I, Karen Herman, hereby depose and say that I am the President of First Choice Body Armor & Equipment, Inc., a defendant in the within action, and that while I do not have personal knowledge of all the facts recited in the foregoing answers to plaintiff's interrogatories, the information contained therein has been collected and made available to me by others, and said answers are true to the best of her information, knowledge and belief, based upon the information made available to me and that therefore the foregoing answers are so verified.

Karen Herman
President
First Choice Armor &
Equipment, Inc.

Lovett Declaration
Exhibit  F  Pg  2

As to Objections:

John A. Leone
BBO No. 567416
O'CONNOR & ASSOCIATES, LLC
100 State Street, 4th Floor
Boston, MA 02109
(617) 723-7201

## CERTIFICATE OF SERVICE

I, John A. Leone, hereby certify that on this 20th day of October, 2005, I caused the foregoing to be served by first class mail upon all counsel of record.

John A. Leone

# O'CONNOR & ASSOCIATES, LLC

## ATTORNEYS AT LAW

100 STATE STREET - FOURTH FLOOR
BOSTON, MASSACHUSETTS 02109-2306

TELEPHONE  (617) 723-7201
FACSIMILE    (617) 723-7202
ADMIN@OCONNORANDASSOCIATES.COM

March 31, 2005

**VIA FACSIMILE TO (503) 220-2480, ELECTRONIC MAIL
AND CERTIFIED U.S. MAIL, RETURN RECEIPT REQUESTED**

Steven T. Lovett, Esq.
STOEL RIVES, LLP
900 S.W. Fifth Ave., Suite 2600
Portland, OR  97204

**RE:  First Choice Body Armor & Equipment, Inc.**

Dear Mr. Lovett:

Consider this letter notice by First Choice Armor &
Equipment, Inc. ("FCA") of its claim against Armor Systems
International, Inc. ("ASI") for compensatory, consequential and
punitive damages in connection with its incompetence,
misrepresentations and failure to fulfill the terms of FCA
Purchase Order 777, dated October 12, 2004.

Recall that ASI expressly accepted the terms of the
purchase order and the accompanying specifications, along with
FCA's deposit of $110,900.  It then failed to fulfill any of its
obligations in spite of countless communications by FCA over
several months seeking compliance.

ASI took some action, however deficient and ultimately
damaging to FCA, only after mine of February 1, 2005.  You were
good enough to respond to that letter, though your note did not
reflect any understanding or subsequent agreement of the
parties, as confirmed by my email to you of February 2 at 5:26
p.m.  Note that ASI did not even come close to its promise in
your letter that it would complete the first FCA vehicles by
February 11.

# O'CONNOR & ASSOCIATES, LLC

As you have undoubtedly heard, ASI abandoned the project without fulfilling the aforementioned purchase order. Indeed, the first two vehicles ASI claimed to be outfitted were nowhere near completion and were badly damaged structurally and cosmetically. They were thus rejected by the end user. The remaining vehicles called for by the purchase order were never completed. ASI left behind a mess at the Rodman Ford facility, which had been provided to ASI to undertake the outfitting.

The end user continues to discover defects and has again rejected the first two vehicles. FCA continues to find hazards, broken components, burn holes, glass fractures, non-installation of required features and myriad other problems causing property damage, remedial expenditures, consequential damages and probable loss of the contract. As explicitly warned in mine of February 1, the opportunities afforded by this customer were forecast to be the single largest source of revenues to FCA in 2005. Through its blatant misrepresentations of its experience, qualifications and expertise, along with outright incompetent performance, FCA's current and future losses appear incalculable. ASI alone, by its ineptitude and its unfair and deceptive trade practices, will be held to account under Massachusetts General Laws, Chapter 93A, pursuant to which FCA claims treble damages and counsel fees.

ASI would be well advised to turn over this letter to its liability insurers. ASI can mitigate FCA's ultimate claim for multiple damages by returning at once the deposit of $110,000, so that those monies can be used to attempt to remediate the shoddy workmanship and related expenses FCA has and will incur in what is now a last-gasp effort to save the contract. The alternative will be for an immediate action to reach and apply monies from its bank accounts or, failing that, as may be due ASI in connection with a recently publicized government project.

Very truly yours,

David M. O'Connor

DMO/maf

cc: First Choice Armor & Equipment, Inc.
    Mr. Jerry Billedeaux
    Mr. Ed Manner



STOEL
RIVES

STEVEN T. LOVETT
Direct (503) 294-9364
stlovett@stoel.com

February 17, 2006

**VIA EMAIL**

John Leone
O'Connor & Associates
100 State Street
Boston, MA 02109-2306

**Re:   *Armor Systems International, Inc.  v. First Choice Body Armor & Equipment, Inc.***
    **U.S. District Court of Massachusetts Case No. 05-10967 RCL**

Dear John:

I write to confirm our telephone call of today and to respond to your subsequent letter.

---

1.     **First Choice's Email and Other Electronically Stored Information.**

I will notice the deposition of John Blackberg of First Choice for 4:00 p.m. on Thursday, March 9, 2006, following Mr. Marciano's deposition.

---

2.     **Deposition Scheduling.**

You said that you didn't have Dave's schedule and couldn't commit to any particular dates but asked that I suggest a schedule. Here's what I suggested, with the understanding that I haven't yet heard from all ASI witnesses as to availability:

Wednesday March 8 at Scibelli Whitely:

10:00   Rodman Ford

2:00    Ryan Dovner

Thursday March 9 at O'Connor and Associates:

10:00   Bob Marciano

Portland3-1535-2522.1 0006162-00005

Lovett Declaration



John Leone
February 17, 2006
Page 2

4:00    John Blackberg

Friday March 10 at O'Connor and Associates:

9:00    Terry Billedeaux

11:00    Colin Henry

You have already received the subpoena of Rodman Ford and the amended notice of deposition for Ryan Dovner. As I mentioned to you and state in my cover letter to Rodman, the date or time of the deposition may need to move when the parties firm up the deposition schedule.

**3.    Updated Information on First Choice's Bids for KBR Business.**

You said First Choice is collecting this information and will produce what there is.

**4.    Records of First Choice's Invoices to KBR and KBR's Payments to First Choice.**

After discussing this issue, we agreed that First Choice would either (1) stipulate that Deposition Exhibit 121 is a First Choice business record that accurately reflects the date First Choice invoiced KBR for the vehicles, that the invoice date is the same as the ship date and that the document accurately reflects the dates First Choice received payment from KBR for the vehicles via Electronic Funds Transfer or (2) produce invoices and other documents that show invoice and shipment dates and dates on which First Choice was paid by KBR and the amount of each payment.

Please let me know right away if you disagree with my description of any aspect of our conversation.

Very truly yours,

Steven T. Lovett
STL:ssb
cc:    Anthony Scibelli
        Client

Lovett Declaration
Exhibit 4 p. 2



900 SW Fifth Avenue, Suite 2600
Portland, Oregon 97204
main 503.224.3380
fax 503.220.2480
www.stoel.com

STEVEN T. LOVETT
*Direct (503) 294-9364*
stlovett@stoel.com

March 21, 2006

**VIA EMAIL**

John Leone
O'Connor & Associates
100 State Street
Boston, MA 02109-2306

Re:    ***Armor Systems International, Inc. v. First Choice Body Armor & Equipment, Inc.***
       **U.S. District Court of Massachusetts Case No. 05-10967 RCL**

Dear John:

I write to confirm our telephone conversation of today regarding each of the outstanding requests outlined in my March 14, 2006 letter to you. I take each of the letters covered in my March 14 letter in turn.

**February 16 and 17, 2006 Letters**

I understand you have the updated information on First Choice's bids, RFQs and Purchase Orders for KBR business and that those documents will go out to me via overnight mail either today or tomorrow.

You also have in your possession for production today or tomorrow all First Choice invoices to KBR. In addition, First Choice will stipulate that the Electronic Fund Transfer dates are accurately reflected on Deposition Exhibit 121.

**February 27, 2006 Letter**

1.    You confirmed that Edward Dovner's testimony that First Choice started to obtain work from KBR in 2003 is mistaken and that the first RFQ from KBR to First Choice is dated February 24, 2004.

2.    You are producing today or tomorrow both of the original bids on the Ford Excursion Project.

Oregon
Washington
California
Utah
Idaho

Lovett Declaration
Exhibit ⅄ Pg 1



John Leone
March 21, 2006
Page 2

We did not specifically discuss the other documents described in paragraph 2 of my February 27, 2006 letter. I know from our March 14, 2006 conversation that you had requested those materials from First Choice and anticipated producing them. Please let me know if that is no longer the case.

> 3.    You said you still do not know whether First Choice is willing to produce the unredacted purchase orders and bids that ASI has requested.

> 4.    Received.

> 5.    You said that First Choice did not have any documents showing profits, revenues, or costs on any of the projects that it asserts it would had been awarded by KBR but for ASI's performance on the Ford Excursion Project. You and I then discussed that ASI is not looking for something so narrow. Though the documents you have described would be responsive and relevant, what we want are any documents related to revenues, profits and costs on any of the products that are the subject of a KBR RFQ that First Choice contends it would have won. I pointed out that, if First Choice got to trial with its lost profits claim, it would need to show not only the total price of the lost project but also what its profits would have been had that project been awarded it. So, First Choice would have to show material, labor and overhead costs, among other things. We want documents reflecting those costs.
>
> You are going to go back to First Choice on those issues as your inquiry to them was more narrow than that.

### March 1 and 10, 2006 Letters

You are producing today or tomorrow the complete 34-page fax of which 000781-000783 is a part. You had not focused on the similar question regarding document 000704-000707 which indicates it is pages 1 through 4 from a 19-page fax but will produce the rest of that document as well. You are also going to produce the REP&CERTS.pdf enclosed with Kim Sawyer's October 25, 2005 email to Fayyaz Sarwar of KBR.

You said that your client has failed to locate the original Purchase Order on the Ford Excursion Project.

Lovett Declaration
Exhibit I Pg 2



John Leone
March 21, 2006
Page 3


Please let me know immediately if you disagree with any portion of the above description of our conversation.

Very truly yours,

Steven T. Lovett

STL:ssb
cc:     Anthony Scibelli (via email)
        Client (via email)

Lovett Declaration
Exhibit  I  Po  2

**Lovett, Steven T.**

| | |
|---|---|
| **From:** | Lovett, Steven T. |
| **Sent:** | Wednesday, April 05, 2006 2:48 PM |
| **To:** | 'John A. Leone' |
| **Subject:** | RE: ASI v. FCA |

John -

I will find out Mssrs Henry and Billedeaux availability and get back to you.  In the meantime, please determine Eddie Dovner's availability to complete his deposition, also via telephone.

Also, please let me know when you are available to confer about remaining discovery issues, all of which have been covered in previous communications.

- Steve

Steven T. Lovett
Technology and Intellectual Property Group
Stoel Rives LLP
900 SW Fifth Avenue
Suite 2600
Portland OR  97204
503-294-9364
503-220-2480 (fax)

## Anne Sullivan

From:        Terry Billedeaux [TerryB@armorsystemsint.com]
Sent:        Tuesday, October 19, 2004 11:34 AM
To:          Anne Sullivan
Cc:          Randy Wadsworth
Subject:     RE: PO# 774

Anne,

This is our correct physical address. I'll send you a note in about an hour
re: the account number when our accounting folks arrive.  Thanks.

....Terry


-----Original Message-----
From: Anne Sullivan [mailto:asullivan@firstchoicearmor.com]
Sent: Tuesday, October 19, 2004 7:25 AM
To: info@armorsystemsint.com
Subject: Re: PO# 774


        I need your company's mailing address so I can send payments to the
correct location.  Also, I want to confirm the physical address is
        110 Vancouver St., Vancouver, WA.  98660.  If you have set up an
account for First Choice Armor & Equipment,  I will need the account number.
        Thank you,    *Columbia St.*
        Anne Sullivan
        First Choice Armor
        Accounts Payable
        508-557-0777 ex11

Lovett Declaration
Exhibit K Pg 1

FC000021

FEB-01-2005  14:44     FIRST CHOICE ARMOR

**Anne Sullivan**

| | |
|---|---|
| From: | Randy Wadsworth [rlw_taxjd@yahoo.com] |
| Sent: | Tuesday, October 19, 2004 12:59 PM |
| To: | Anne Sullivan |
| Subject: | PO #774 |

Anne,

Please use account "FCA100" and reference "PO #774" on
all correspondence and payments.


Thanks!

Randy Wadsworth
Armor Systems International, Inc.
503-475-0000

_____

Do you Yahoo!?
Declare Yourself - Register online to vote today!
http://vote.yahoo.com

Lovett Declaration
Exhibit  K  Pg  2

1

FC000022

JUL-19-2005  16:32      FIRST CHOICE ARMOR                    5099416941    P.07

## Edward Dovner

From:     Edward Dovner
Sent:     Friday, July 02, 2004 9:22 PM
To:       'Bob Marciano'
Subject:  RE: FORD EXCURSION ARMOR PROTECTION KITS

Waiting to here back from Randy and Terry.

Eddie

---

**From:** Bob Marciano [mailto:BobM@armorsystemsint.com]
**Sent:** Saturday, July 03, 2004 5:16 AM
**To:** Edward Dovner
**Subject:** FORD EXCURSION ARMOR PROTECTION KITS

Eddie:

Outlined below is a summary of the conversation we had regarding providing armor protection for 16 Ford Excursions:

1. Threat protection level needs to be equivalent to NIJ Level IV

2. Areas of the vehicles that will meet this standard of protection include; ballistic glass for all windows, armor protection for all doors and pillars,as well as blast mitigation protection for the floor of the vehicle.

3. Price for armor protection for each vehicle is $49,600.

4. Delivery of the first armor kit will be made within 3-4 weeks from the contract signing and receipt of a downpayment that is acceptable to both parties. Completion of the order will be completed within 8 weeks from .contract signing.

5. Installation assistance is available from ASI. Assuming we enter into a contract ASI and First Choice will need to work out the specifics .

Eddie, call me if you have any other questions.

Bob Marciano
Director of Civilian Sales
Armor Systems International
(360) 993-5181 Office
(360) 600-8339 Mobile

FC000030

Lovett Declaration
Exhibit  K  Pg  3

## Edward Dovner

| | |
|---|---|
| **From:** | Jody Eberhart (Internet) |
| **Sent:** | Wednesday, June 01, 2005 7:56 AM |
| **To:** | Edward Dovner |
| **Cc:** | ERD1953@aol.com |
| **Subject:** | SBA Shoot data |

Eddie;

1. I have shot the below worn vest models:

a. Nashville TN / 2004 / MF 2000 (3 year old panel)

b. Albuquerque, NM / 2003 / MF 123 (1 year old panel)

2. We have also called in and shot a vest from Santa Anna Pueblo PD, NM, MSF 1 II, that was worn for over a year.

Jody

**Terry Billedeaux**

| | |
|---|---|
| **From:** | Terry Billedeaux [TerryB@armorsystemsint.com] |
| **Sent:** | Thursday, February 17, 2005 9:26 AM |
| **To:** | 'Edward Dovner' |
| **Cc:** | 'Randy Wadsworth'; 'Ed Menteer'; 'Jim Henry' |
| **Subject:** | RE: First Choice and ASI Working Arrangements |

Eddie,

Since Jim Henry is the PM on this project and has a thorough knowledge of the project status in Massachusetts, when he returns from the Philippines on Sunday I would suggest we have a conference call on Monday. Thanks.

....Terry

---

**From:** Edward Dovner [mailto:edovner@firstchoicearmor.com]
**Sent:** Wednesday, February 16, 2005 2:15 PM
**To:** Terry Billedeaux
**Subject:** RE: First Choice and ASI Working Arrangements

Terry please call me regarding any complications that ASI may have in finishing this project on time.

Best regards
Edward Dovner
CEO
First Choice Armor

---

**From:** Terry Billedeaux [mailto:TerryB@armorsystemsint.com]
**Sent:** Wednesday, February 16, 2005 2:30 PM
**To:** Edward Dovner
**Cc:** 'Ed Menteer'; 'Randy Wadsworth'; 'Jim Henry'
**Subject:** First Choice and ASI Working Arrangements

Eddie,

As you know, ASI is now installing the first four Excursion kits. We have four people, including our CTO, on the ground in Brockton and another installer arriving within the week. We expect to be finished with the first set of four kits by the end of February.

ASI would be happy willing to help First Choice install the armor on the remaining order at a reduced rate which includes paying the wages/expenses for our workers in exchange for a waiver of any claim First Choice might have relating to the delayed delivery of the Excursion kits. We think this arrangement will help establish a solid working relationship for the future by providing the parties with a clean slate. We hope First Choice will accept the offer.

Please give it some thought and return your answer directly to me. Thanks.

....Terry

Terry Billedeaux
Armor Systems International
110 Columbia Street
Vancouver, WA 98660

**CONFIDENTIAL**

ASI000028

8/10/2005



Lovett Declaration

## Terry Billedeaux

| | |
|---|---|
| **From:** | Terry Billedeaux [TerryB@armorsystemsint.com] |
| **Sent:** | Friday, February 11, 2005 4:19 PM |
| **To:** | 'Edward Dovner' |
| **Subject:** | RE: HP White Info on Aztik 75 |
| **Attachments:** | HP White Level IV (30 cal AP) 6_18_04.pdf |

The pictures must have gone through Borneo, but I just got them. Here is the HP White test on both the Aztik 75 and 100 for Level IV.

....Terry

---

**From:** Edward Dovner [mailto:edovner@firstchoicearmor.com]
**Sent:** Friday, February 11, 2005 3:59 PM
**To:** Terry Billedeaux
**Subject:** RE: HP White Info on Aztik 75

I already sent the pictures.

Eddie

**From:** Terry Billedeaux [mailto:TerryB@armorsystemsint.com]
**Sent:** Friday, February 11, 2005 6:57 PM
**To:** Edward Dovner
**Cc:** 'James Henry'
**Subject:** HP White Info on Aztik 75

Eddie,

I have some HP White info on Aztik 75. I will send it to you when I receive the pictures for the firewall as we urgently need it for Dubai. Thanks.

....Terry

**CONFIDENTIAL**

**ASI000030**

8/10/2005

Lovett Declaration

## Terry Billedeaux

| | |
|---|---|
| **From:** | Terry Billedeaux [TerryB@armorsystemsint.com] |
| **Sent:** | Tuesday, January 11, 2005 1:46 PM |
| **To:** | 'Edward Dovner' |
| **Subject:** | RE: Pretty gruesome!!! (Caution) |

Eddie,

I guess it pays to keep your head down. I forwarded the pictures on.

....Terry

---

**From:** Edward Dovner [mailto:edovner@firstchoicearmor.com]
**Sent:** Monday, January 10, 2005 10:45 AM
**To:** Tom Madison; Ray Chouinard
**Cc:** Terry Billedeaux
**Subject:** FW: Pretty gruesome!!! (Caution)


## Consider yourself warned!

First picture is the gun, the second is ochy!!!!!!!!
A backwoods hunter from the Alabama NG spotted this guy, complete with suicide bomber vest, inside a compound in the Green Zone in Iraq.
He used a well placed 50 cal. sniper round to stop him.

CONFIDENTIAL

ASI000031

Lovett Declaration
Exhibit 1. Po 2

(360) 993-5181
(360) 737-0743 Fax

CONFIDENTIAL

ASI000029

Lovett Declaration
Exhibit  1  Pg.  4